2007 OK CR 16

**Michael DeWayne SMITH, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2003–1120.**

Court of Criminal Appeals of Oklahoma.

April 26, 2007.

---

Stephen Deutsch, James Siderias, Assistant District Attorneys, District Attorney's Office, Oklahoma City, OK, attorneys for the State at trial.

Traci J. Quick, L. Wayne Woodyard, Capital Defense Counsel, Oklahoma Indigent Defense System, Capital Trial Division, Sapulpa, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Robert Whittaker, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

A. JOHNSON, Judge.

¶1 Appellant Michael DeWayne Smith, was tried by jury for the following crimes: Burglary in the First Degree in violation of 21 O.S.2001, § 1431 (Count 1); two counts of Murder in the First Degree in violation of 21 O.S.2001, § 701.7 (Counts 2 and 3); Robbery with a Firearm in violation of 21 O.S.2001, § 801 (Count 4); and Arson in the First Degree in violation of 21 O.S.2001, § 1401 (Count 5), in Case Number CF–2002–1329 in the District Court of Oklahoma County. The jury returned verdicts of guilty on all five counts. In the penalty stage of the trial the jury found the existence of two aggravating circumstances and set punishment at death for the murders.[1] The jury fixed the punishment for the burglary at twenty years imprisonment; for the robbery at thirty years; and for the arson at thirty-five years with a fine of $25,000.00. The Honorable Twyla Mason Gray sentenced Smith on each count in accordance with the jury's verdicts.

¶2 Smith raises eleven claims of error on appeal. We find no merit in any of the claims and affirm the judgment and sentence.

## I. FACTS

¶3 The Appellant, Michael DeWayne Smith, was a member of the Oak Grove Posse, a subset of the Crips gang in Okla-

---

1. The jury found the following aggravating circumstances: (1) each murder was especially heinous, atrocious, or cruel; and (2) there existed a probability that Smith would commit future acts of violence constituting a continuing threat to society.

homa City. On November 8, 2000, three members of the Oak Grove Posse attempted to rob Tran's Food Mart in south Oklahoma City. The three robbers were Teron "T–Nok" Armstrong, Kenneth "Peanut" Kinchion, and Dewayne "Pudgy–O" Shirley. During the course of the robbery attempt, the owner of the store shot and killed Armstrong. Kinchion and Shirley were eventually arrested. Smith was not involved in the attempted robbery but had close personal ties to Armstrong.

¶ 4 On Friday, February 22, 2002, two days before the trial of Kinchion and Shirley was scheduled to start, Smith left his apartment in the Del Mar Apartments in Oklahoma City early in the morning. His roommate, Marcus Berry (also known as Marcus Compton), saw Smith take a .357 caliber revolver with him. Smith went first to Janet Moore's apartment looking for her son Phillip Zachary who he believed was a police informant. Smith had earlier told Berry that "snitches need to be dead."

¶ 5 The evidence supports the conclusion that Smith arrived at Moore's apartment sometime before 6:30 a.m. Shoe prints indicated that Smith kicked in her front door and then her bedroom door. Moore began screaming, and, at approximately 6:30 a.m., a downstairs neighbor heard arguing between a man and a woman and then a single "pop" followed by footsteps.

¶ 6 Later that morning around 7:30 a.m. Smith arrived at A–Z Mart, a convenience store approximately fifteen miles from the Del Mar Apartments. A–Z Mart was immediately next door to Tran's Food Mart, the site of the earlier robbery attempt where Armstrong had been killed. The clerk on duty that morning at A–Z Mart was Sarath "Babu" Pulluru. Pulluru was filling in for the store owner who was taking the day off. Smith told detectives that he emptied two pistols into Pulluru, took some money, and used bottles of Ronsonol lighter fluid to start fires in the store. Smith said he set fire to the cash register, Pulluru's body, and a back room in order to destroy evidence. Shoeprints at the scene tracked Pulluru's blood from the cash register area, where his body was found, down the aisle to where the Ron-

sonol lighter fluid was displayed for sale. The bloody shoe prints at the A–Z Mart were similar to the shoe prints found at Moore's apartment.

¶ 7 At 1:00 or 2:00 a.m. the next morning, Smith returned to his apartment and told Berry that he had killed Janet Moore. He also told Berry that he had done something else to "take care of business," that he had avenged his family.

¶ 8 At 3:00 or 4:00 a.m., Smith went to Sheena Johnson's apartment and told her that he had killed two people that day. During that conversation, Smith told her that he had killed Phillip Zachary's aunt because Zachary had been "snitching." Johnson had already learned of Moore's murder and told Smith that the victim was Zachary's mother, not his aunt. In response, Smith shrugged his shoulders, and said "oh well." Smith showed Johnson how he held his gun when he shot Moore and went on to say that he had also killed a person at a "chink" store. During his description of the second homicide, Smith mentioned something about one of his fellow gang members having his head blown off during a robbery. He said he would kill anyone who crossed his family. Smith also mentioned that someone had been on television "dissing" his set in regard to that robbery. Subsequently, Johnson contacted CrimeStoppers and reported the conversation. When she made that report, Smith was already in police custody on a different matter.

¶ 9 Three days after Smith was detained, detectives interviewed him. Smith was given *Miranda* warnings, waived them, and agreed to talk. During the interview, Smith first denied committing the murders, then admitted only to being present, and finally admitted committing both murders. He explained he killed both victims in retaliation for wrongs done him or his family. He told detectives he went to Moore's apartment looking for her son, that Moore panicked and started screaming, so he had to kill her. He said he killed Pulluru in retaliation against the store owner who shot Armstrong and in retaliation for disrespectful comments about Armstrong in the press attributed to someone from the A–Z Mart Mart. According to

Smith, as he fired off the initial barrage of bullets, Pulluru asked "what did I do?" Smith told him: "[M]y mother-f\* \* \* \* \* \* little homey, my people on the set, like, bam, bam, before he died I let him know, like this is for my little homey that's dead. Bam, bam, bam." Smith also told detectives that he had disposed of the clothes he had worn during the murders, that he had wiped down Moore's apartment to eliminate fingerprints, and that he set fire to whatever he had touched in the A–Z Mart to destroy evidence.

## II. JURY SELECTION ISSUES

¶ 10 In his first assignment of error, Smith contends that the State's proffered race-neutral reasons for striking a potential alternate juror with a peremptory challenge was pretextual, and that the juror's excusal from the jury violated the Equal Protection Clause of the United States Constitution under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

■ ¶ 11 *Batson* establishes the following three part analysis: (1) the defendant must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race; (2) after the requisite showing is made, the burden shifts to the prosecutor to articulate a race-neutral reason related to the case for striking the juror in question; and (3) the trial court must then determine whether the defendant carried his burden of proving deliberate discrimination. 476 U.S. at 96–98, 106 S.Ct. at 1723–24, 90 L.Ed.2d at 87–88. As for the second requirement, the United States Supreme Court noted the race-neutral explanation by the prosecutor need not rise to the level justifying excusal for cause, but it must be a "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges. *Neill v. State*, 1994 OK CR 69, ¶ 17, 896 P.2d 537, 546 (quoting *Batson*, 476 U.S. at 98, n. 20, 106 S.Ct. at 1723, n. 20, 90 L.Ed.2d at 88–89, n. 20). The trial court's findings as to discriminatory intent are entitled to great deference, *id.*, and our review is for clear error only. *Pennington v. State*, 1995 OK CR 79, ¶ 29, 913 P.2d 1356, 1365. We review the record in the light most favor-

able to the trial court's ruling. *Neill*, 1994 OK CR 69, ¶ 17, 896 P.2d at 546.

■ ¶ 12 The record here shows the prosecutor offered several explanations for striking the potential alternate juror. A neutral explanation in the context of this analysis means one based on something other than the race of the juror. *Short v. State*, 1999 OK CR 15, ¶ 13, 980 P.2d 1081, 1091. At this step in the inquiry, the issue is the facial validity of the prosecutor's explanation. *Id.* Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason given is deemed race neutral. *Id.* (quoting *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395, 406 (1991)); *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834, 839 (1995).

■ ¶ 13 Here, the prosecutor used a peremptory challenge to excuse the venireman. In exercising the challenge, the prosecutor explained that:

> He [the juror] does not want to sit on this jury. His initial questions. We're also concerned about the tattoos on his neck. That's generally a commonplace where gang members do tattoos of their initials or letters. They are kind of done in sort of a calligraphy, which again is common among gang members. When the Court asked him questions about gang activity, even though the Court had done that not in the presence of rest of the jury, and we're also concerned with his age and his ability to sit on a case of this magnitude. Those are all reasons together that we have kicked or excused him.

(Tr. 3 at 167).

¶ 14 Over defense counsel's objection, the trial court judge explained that she had inquired of the juror concerning the tattoo prior to the prosecutor exercising his peremptory challenge, and noted that in her experience, people get tattoos for gang related reasons and many do not. The judge then explained:

> I do believe that he [the juror] has stated that he would prefer not to be here. I do believe that that is a reason that is race-neutral because I think it's clear he would

prefer not to be here and I think he has stated that. So, I don't believe that your striking him is for an illegal purpose or for the purpose of excluding, quote, unquote, 'minority' members of the jury.

(Tr. 3 at 167).

¶ 15 On the basis of this record, we agree with the trial court's finding that the prosecutor's explanation (the juror's expressed reluctance to sit) provided a facially valid reason that in itself does not reveal an intent to discriminate on the basis of race. We move now to the next stage of the *Batson* analysis.

¶ 16 Once a race-neutral explanation for the peremptory strike has been advanced, the opponent of the strike bears the burden of proving purposeful discrimination. *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724, 90 L.Ed.2d at 88–89; *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771, 131 L.Ed.2d at 839. A trial court's decision on the issue of discriminatory intent will not be overturned unless we are convinced the determination is clearly erroneous. *Short*, 1999 OK CR 15, ¶ 17, 980 P.2d at 1092. Here the trial court chose to believe the prosecutor's proffered race neutral explanation. There is no evidence in this record establishing that the prosecutor in this case had a history of purposeful discrimination against jurors on the basis of race or that race was even an issue in the case. No allegations were made that the commission of the offenses or Smith's prosecution for them were in any way racially or ethnically moti-

vated. We find no error in the trial court's determination that Smith failed to carry his burden of showing purposeful discrimination.

¶ 17 Smith also raises two arguments that were not raised below in an attempt to demonstrate that the prosecutor's proffered justification for striking the juror was a pretext for purposeful racial discrimination. In the first, he claims the prosecutor's expressed concern about the juror's potentially gang-related tattoo was in itself evidence of an improper desire to exclude him based solely on race because, according to Smith, gang membership is typically associated with minority races.[2] In the second, he claims that the prosecutor's proffered explanation was pretextual because the prosecutor did not strike two other potential alternate jurors who suggested that they preferred not to serve on the jury. We find neither argument persuasive.

¶ 18 Smith's first argument misses the mark. The record indicates that the State intended to show that Smith's involvement in at least one of the murders was related to his gang activities and that gang-related matters would permeate the trial. The motive for the Pulluru murder in particular was linked to Smith's desire to seek revenge against a convenience store owner he believed made disparaging comments to the media about Teron "T–Nok" Armstrong, a fellow gang member who was killed during the course of the attempted robbery at Tran's Food Mart

2. Smith cites numerous extra-record sources to support his position that "common usage of the word 'gang' or term 'Crips' in Oklahoma County courtrooms is well-documented as applying overwhelmingly to African–American defendants." Even if we were to accept Smith's contention that peremptorily striking a juror for gang membership is the same as striking him for his race, the fact is, potential gang membership or sympathy was just one of several reasons offered by the prosecutor as a basis for the strike. Where a prosecutor offers a discriminatory explanation for a strike among a number of other permissible and plausible race-neutral reasons, and the trial court bases its decision on one of the race-neutral explanations, there is no *Batson* violation. *Rice v. Collins*, 546 U.S. 333, 126 S.Ct. 969, 975–76, 163 L.Ed.2d 824 (2006). Here, the record reflects that in addition to gang concerns, the prosecutor also voiced concerns related to the potential juror's unwillingness to serve on the jury as well as his age. Disregarding the prof-

fered gang rationale, the trial court judge clearly decided the issue on the basis of the race-neutral reason that the juror did not want to serve on the jury. Under the *Rice* rationale, therefore, even if the proffered gang reason was discriminatory, because the judge disregarded that reason and based her decision instead on one of the other race-neutral reasons, there is no *Batson* error here. Additionally, as noted, the prosecutor in this instance also explained that he was concerned about the juror's age and his resulting ability to sit on a case of this magnitude. In *Rice*, 126 S.Ct. at 975, the Supreme Court found that a prosecutor's concern about a juror's youth was a valid race-neutral explanation for a peremptory strike because "[i]t is not unreasonable to believe the prosecutor remained worried that a young person with few ties to the community might be less willing than an older, more permanent resident to impose a lengthy sentence for possessing a small amount of controlled substance."

in 2000. Also, the prosecutor certainly knew before trial that the defense intended to call an expert witness to testify in the penalty phase of the trial about the history, sociology, and dynamics of gangs in Oklahoma in an effort to provide mitigating evidence on Smith's behalf. With gang activity and gang-related matters at issue in this case, any concern the prosecutor showed in the possible gang involvement of a prospective juror was reasonable and race neutral.[3]

¶ 19 We are also unpersuaded by Smith's argument that the prosecutor's failure to strike two other potential alternate jurors who also suggested that they did not want to serve constituted evidence of a pretext. The fact that the prosecution failed to challenge other potential jurors who also said they did not want to sit does not erode the legitimacy of the race-neutral explanation for challenging one juror. *Cf. Short,* 1999 OK CR 15, ¶ 15, 980 P.2d at 1092 (holding that "[t]he fact that this reason, criminal records by family members, was not used in every instance in which it arose to excuse potential jurors, does not lessen its legitimacy as a race-neutral explanation"). Further, Smith's claim on this score is factually infirm. The record shows that contrary to Smith's suggestion, the two jurors did not express an unwillingness to serve on the jury, much less do it in the same blunt terms as the excused juror. Instead, the record of voir dire shows the responses of the other two jurors were equivocal. Saying that sitting on a jury in a capital case "is not an easy thing," or that being surprised at receiving a summons for jury duty, or that deciding between life without parole and death "would be hard choices to make" do not indicate an unwillingness to serve that is equivalent in any way to the sentiment expressed by the excused potential juror who said "I really don't want to be here."[4]

¶ 20 Smith also asserts that exclusion of this minority juror undermined the reliability of his death sentence under the Eighth Amendment of the United States Constitution. Smith raises this claim in a single-sentence assertion. He makes no attempt at developed argument, cites no authority, and points to no portion of the record for factual support. The Eighth Amendment prohibits excessive bail, excessive fines, and imposition of cruel and unusual punishment. Because Smith offers no explanation of how exclusion of the potential juror violated this constitutional provision, his mere assertion is insufficient to demonstrate the existence of legal error, much less demonstrate that the alleged error had a substantial effect on the outcome of the trial or sentencing proceeding.

## III. FIRST STAGE ISSUES

### A. Joinder of Counts

¶ 21 Smith claims that the joinder of the two murders in a single trial deprived him of a fair trial. Smith raised the joinder issue below by objecting and moving for severance. The district court overruled the objection and denied the motion. We review a district court's joinder of counts or denial of severance for an abuse of discretion. *Lott v. State,* 2004 OK CR 27, ¶ 37, 98 P.3d 318, 334. Absent an abuse of discretion resulting in prejudice, the decision of a trial court to grant or deny severance will not be disturbed on appeal. *Jones v. State,* 1995 OK CR 34, ¶ 26, 899 P.2d 635, 644.

---

3. Additionally, allowing a gang member to serve on a jury when another gang member is on trial for gang-related criminal activity could compromise the accused's right to a fair trial if the gang-member juror turned out to be a member of a rival gang, or was in sympathy with a rival gang. Moreover, allowing a gang member to participate in jury deliberations in a gang-related case could place the jurors themselves in jeopardy. Indeed, the jurors in this case expressed concerns about the possibility of gang reprisals against themselves (See District Court's Findings of Fact Re: Order Sealing Records at 4 (Supp. Rec. filed Sep. 10, 2004)). As a result, the trial court judge placed all juror identity information under seal. Under the circumstances, therefore, where the subject matter of the trial revolved around gang-related criminal activities, the prosecutor's concerns that a juror might have gang connections or sympathies were reasonable.

4. An earlier round of questioning during voir dire included this exchange between the prosecutor and the excused potential alternate juror:

> [Q.] Have you ever wanted to sit on a jury?
> [A.] No.
> [Q.] Still feel that way?
> [A.] Yeah.

¶ 22 Smith contends that joinder of the Moore and Pulluru murders did not satisfy the criteria for joinder set out in *Glass v. State*, 1985 OK CR 65, ¶ 8, 701 P.2d 765, 768. He also claims that combining two separately charged murders, one of which he contends was not supported by the evidence, resulted in prejudicial joinder in that joinder of the two offenses increased the likelihood that the jury would use the proof of the stronger case to convict on the weaker. Finally, Smith claims that joinder of the two counts violated the statutory prohibition at 22 O.S.2001, § 404 against alleging more than one offense in a single charging information. We address each claim in turn.

### 1. Joinder Under *Glass*

¶ 23 In *Glass*, 1985 OK CR 65, ¶ 8, 701 P.2d at 768, we held that joinder of separate offenses is permitted if the offenses are part of a series of criminal acts or transactions. Joinder of a series of criminal acts is proper where the joined counts refer to: (1) the same type of offenses; (2) occurring over a relatively short period of time; (3) in approximately the same location; and (4) proof of each act or transaction overlaps so as to show a common scheme or plan. *Id.* ¶ 9, 701 P.2d at 768. Smith contends that the two murders were not properly joined because they were not the same type of crime, nor sufficiently close geographically, nor part of a common scheme or plan.

#### a. *Type of Offense*

¶ 24 Smith's argument that the two offenses are not the same type is not convincing. Janet Moore and Sarath Pulluru were both murdered. Both murders were accomplished in the same manner (i.e., through use of handguns). The fact that Moore was killed in an apartment while Pulluru was killed in a convenience store does not change the nature of the charged offenses. Murder by handgun in an apartment is the same type of offense as murder by handgun in a convenience store. Nor does the fact that Moore was killed while Smith was looking for her son who he thought was an informant while Pulluru was killed for being employed by a convenience store owner against whom Smith sought revenge change the nature of the offenses. Murder in retaliation for being the mother of an informant is the same type of offense as murder in retaliation for being an employee of someone who spoke out disrespectfully about a fellow gang member.

#### b. *Proximity*

¶ 25 Smith's argument that the two killings were not sufficiently close geographically is also unconvincing. Smith claims that because the sites of the two murders were fifteen miles apart, they fail to satisfy *Glass's* requirement that the offenses occur in approximately the same location. *Glass* did not establish an arbitrary maximum distance for determining the proximity nexus necessary for joinder. Rather, *Glass* required only that the offenses occur in "approximately the same location." *Glass*, 1985 OK CR 65, ¶ 9, 701 P.2d at 768. In *Glass* we found that joinder was proper though the offenses were committed several blocks apart. *Id.* ¶ 10, 701 P.2d at 768. In *Pack v. State*, 1991 OK CR 109, ¶ 8, 819 P.2d 280, 283, we applied *Glass* and found joinder proper where robberies of different victims were committed five miles apart. In *Middaugh v. State*, 1988 OK CR 295, ¶¶ 9–10, 767 P.2d 432, 435, we also applied *Glass* and found joinder proper where the offenses were committed in two different towns located within the same county. In this instance, given Oklahoma City's sprawling geography and the fact that both murders occurred within the city limits in south Oklahoma City, we conclude that the two murders were committed in sufficiently close proximity.

#### c. *Overlapping Proof*

¶ 26 Nor are we persuaded by Smith's contention that the two murders were not properly joined as a series of criminal acts because the proof of each offense did not overlap so as to show a common scheme or plan. In this argument, Smith asserts that the Moore and Pulluru murders were unrelated crimes and therefore represented at most a crime spree. Smith claims that criminal acts committed as part of a crime spree may not be joined together in a single trial. In support of his position, Smith relies on

*Knighton v. State*, 1996 OK CR 2, ¶ 36, 912 P.2d 878, 889, for the proposition that evidence of a crime spree does "not, on its own, justify placing two or more crimes before a single jury" (Appellant's Brief at 33).

¶ 27 Smith's reliance on *Knighton* is misplaced. *Knighton* dealt solely with the question of the admissibility of evidence under the common scheme or plan exception to the "other crimes" rule of 12 O.S. § 2404(B) of the Oklahoma Evidence Code. *Knighton* did not, as Smith suggests, have anything to say about the propriety of joining two or more crimes for trial before a single jury under the joinder statute at 22 O.S.2001, §§ 436–439.

 ¶ 28 The joinder statute permits joinder of offenses if the crimes are part of a series of criminal acts or transactions and the proof of each overlaps so as to show a common scheme or plan. *Glass*, 1985 OK CR 65, ¶ 9, 701 P.2d at 768. Joinder of separate offenses into a single trial is a matter based on considerations of judicial economy (i.e., whether proof of the separately charged crimes overlaps to such an extent that trying them separately would constitute a waste of judicial resources). *See e.g., Allison v. State*, 1983 OK CR 169, ¶ 11, 675 P.2d 142, 146 (finding joinder of multiple embezzlement

counts proper where nearly all of state's witnesses testified about each count and severance "would have resulted in a considerable waste of judicial resources"). Thus, the degree to which the proof of the separately charged offenses overlaps in showing that a series of criminal acts or transactions constitute a common scheme or plan determines whether joinder is proper.

¶ 29 By relying on *Knighton*, and other cases dealing with the admissibility of evidence of other crimes, wrongs, or acts, Smith confuses the overlapping proof requirement of the joinder statute with the common scheme or plan requirement set out in the Evidence Code at 12 O.S.2001, § 2404(B). Under § 2404(B), a showing of common scheme or plan is necessary to fulfill the evidentiary gatekeeping function of ensuring that evidence of uncharged criminal activity is excluded unless it is probative of a disputed issue in the trial of the charged offense. *James v. State*, 2007 OK CR 1, ¶ 3, 152 P.3d 255, 256–57. As noted above, *Knighton* and related cases cited by Smith address only the question of the admissibility of evidence of uncharged criminal acts as proof of a charged offense.[5] These cases have no application to the joinder issue presented here.[6]

---

5. Smith argues that allowing a jury to hear evidence of other offenses joined together in a single trial constitutes the admission into evidence of a form of other crimes evidence. Thus, Smith asserts that our cases defining the term "common scheme or plan" in relation to "other crimes" evidence under the Evidence Code at 12 O.S.2001, § 2404(B) should likewise apply to the definition of "common scheme or plan" used in cases where joinder of offenses is at issue. Assuming for the sake of argument that Smith's premise is correct (i.e., that offenses joined together for a single trial constitute a form of "other crimes" evidence), it is clear that by enacting separate statutory provisions governing joinder (i.e., 22 O.S. §§ 436–439), the legislature intended joined offenses to be treated differently than § 2404(B) evidence. We decline to hold, therefore, that the propriety of joinder must be determined on the basis of whether the joined offenses would be admissible as evidence of other crimes, wrongs, or acts under 12 O.S.2001, § 2404(B).

6. In his reply brief, and at oral argument, Smith extended his argument to claim that the Moore and Pulluru murders were not properly joined because the evidence did not show how the "facts of one crime tend to establish the other

such as where the commission of one crime depends or facilitates the commission of the other crime" (Appellant's Reply Brief at 13 (citing *Hammon v. State*, 1995 OK CR 33, ¶ 65, 898 P.2d 1287, 1302; *Atnip v. State*, 1977 OK CR 187, ¶ 10–11, 564 P.2d 660, 663)). Again, Smith confuses the question of admissibility of evidence with the separate question of whether multiple offenses should be joined together for trial. One of the criteria for determining the admissibility of evidence of other uncharged crimes or wrongful acts under 12 O.S.2001, § 2404(B) is that the evidence must show how the commission of one crime or act facilitated the other. This showing of interdependence between the evidence of an uncharged crime or wrongful act and the charged crime at issue is necessary to ensure that evidence of other crimes or wrongs committed by a defendant is relevant (i.e., probative of a disputed issue necessary to support the State's burden of proof on the charged offense). *See James*, 2007 OK CR 1, ¶ 3, 152 P.3d at 256–57. When deciding whether to join separately charged offenses together in a single trial, however, the dispositive question is not whether one offense constitutes relevant evidence probative of a disputed issue in the other offense, but instead, whether the separate offenses are sufficiently re-

¶ 30 In this instance, the two murders were properly joined. Evidence for each murder consisted of Smith's confession tape, the testimony of Detectives Sterling and McNutt, as well as the testimony of Marcus Berry and Sheena Johnson. The confession tape and witness testimony contained admissions and statements made by Smith during the course of conversations that simultaneously covered both murders. Trying each murder separately by presenting the same confession tape and witness testimony, therefore, would result in waste of judicial resources. Furthermore, because the tape and testimony contained admissions and statements made by Smith during the course of conversations that simultaneously covered both murders, wrenching the relevant admissions and statements from the context in which they were uttered would likely render the testimony unintelligible to a jury. Because the proof of each murder was inextricably intertwined with proof of the other, severance would have been impractical.

¶ 31 Furthermore, despite Smith's arguments that the two murders were unrelated, and therefore not properly joined, we are convinced that the proof related to each murder did overlap, and that it did so in such a way as to show a common scheme or plan. Specifically, the forensic evidence showed that at least one of the handguns used in the Moore murder was also used in the Pulluru murder. Additionally, Smith's admissions showed that in both instances he attempted to conceal his identity by eliminating fingerprint evidence at the scene (albeit in Moore's case he did so by wiping down the apartment and in Pulluru's case he did so by setting fire to portions of the convenience store where he touched things). Moreover, Smith's statements to police, to fellow gang member Marcus Berry, and to Sheena Johnson overlapped sufficiently to create a logical connection between the two murders. Smith's statements established the requisite nexus

by tying both murders together as part of a common plan to take care of business that day by exacting revenge or retaliation against persons who had either wronged him directly or wronged him indirectly through his gang family.

¶ 32 In the case of the Moore murder, for example, Smith told Marcus Berry several days before the killings that Janet Moore's son was a "snitch" and that "snitches need to be dead." On the morning of the day following the killings, Smith told Berry that: (1) he had done something he had to do; (2) he had handled his business; and (3) he had gotten revenge on people who "crossed his family." In a separate conversation, Smith told Sheena Johnson "[t]hat bitch ass n* * * * * [Moore's son] sent the police to my house, my apartment" and that as a result, he had gone to Moore's apartment looking for the son. Smith told her that once he was in Moore's apartment, she started screaming so he shot and killed her.

¶ 33 The Pulluru murder was likewise shown to be part of Smith's plan to "take care of business" through retaliation. Evidence supporting this motive included the facts that Smith professed to have been very close to gang member Armstrong who was killed in the Tran's Food Mart robbery attempt. Specifically, Smith claimed to have brought Armstrong into the gang, paid his funeral expenses, and told Armstrong's mother that he would avenge Armstrong's death. Furthermore, Smith wore Armstrong's nickname "T–Nok" as a tattoo, and shouted "this is for my little homey that is dead" as he fired multiple shots into Pulluru.

¶ 34 Mr. Han Vo provided additional linkage between the 2000 robbery and the revenge-retaliation aspect of the Pulluru murder. Mr. Vo was the owner of Tran's Food Mart and was the victim of the attempted robbery in which Armstrong was killed. Mr. Vo testified that his convenience store was located immediately adjacent to the store where Pulluru was killed. He testified fur-

lated as to be considered a part of a series of criminal acts or transactions such that they may logically be tried together without unfairly prejudicing the defendant. Requiring that joinder of separately charged offenses be conditioned on their probative value in proving the other

charged offenses would transform the joinder question into an evidentiary issue and negate the clear intent of the legislature, as expressed in 22 O.S.2001, § 436, that separate offenses may be joined together for trial if they are part of a related series of criminal acts or transactions.

ther that on the Friday morning of the Pulluru homicide, he was in the district attorney's office preparing for the trial of the two surviving would-be robbers. By showing that the Pulluru murder occurred within yards of the location where Armstrong was killed, and that the Pulluru murder occurred within two days of the trial of the surviving robbers, Mr. Vo's testimony provided evidence supporting an inference that the Pulluru murder was part of a plan to exact revenge for the events surrounding Armstrong's gang-related death.

¶ 35 In summary, the evidence available to the district court judge at the time she ruled on Smith's joinder claims, and the development of that evidence at trial showed the Moore and Pulluru killings: (1) occurred within a relatively short period of time (i.e., one-and-a-half hours); (2) occurred in approximately the same location (i.e., south Oklahoma City); and (3) overlapped in such a way as to indicate a common scheme or plan (i.e., a plan to retaliate against persons Smith perceived to have wronged him or his gang or his fellow gang members). This evidence was sufficient to link the two murders together as a series of related criminal acts. The district court judge did not abuse her discretion in overruling Smith's objection to joinder or denying his motion for severance.

### 2. Prejudicial Joinder and Weight of Evidence

■ ¶ 36 Smith also claims that combining two separately charged murders, one of which he contends was supported by weak or nonexistent evidence, resulted in prejudicial joinder sufficient to deny him a fair trial. Smith argues that joining the Moore case, which he characterizes as supported by weak or insufficient evidence, with the Pulluru case and its gruesome gang-related evidence, increased the likelihood that the jury would return a guilty verdict in both cases by: (1) relying on the proof of the stronger Pulluru murder to convict on the weaker Moore murder; or (2) inflaming the jury so much on

evidence of the gang-related Pulluru murder that the jury reached a guilty verdict on the Moore murder on the basis of passion or prejudice.

¶ 37 Some courts have recognized that joinder of offenses in a single trial may be prejudicial if there is great disparity in the amount of evidence underlying the joined offenses.[7] Contrary to Smith's assertions, however, this is not one of those cases. In this claim, Smith focuses exclusively on the evidence of the Pulluru murder and argues that the weight of its evidence overpowered weak or nonexistent evidence in the Moore case. Smith ignores, however, the strong independent evidence supporting the Moore verdict. In particular, he gives no consideration to his videotaped confession and ignores the fact the confession was well corroborated by admissions made separately to Sheena Johnson and Marcus Berry. The Moore murder was proved by separate and distinct evidence sufficient to support a guilty verdict. We find no merit to Smith's claim of prejudicial misjoinder based on disparities in the quanta of evidence.

¶ 38 Smith also asserts that the jury reached its verdict in the Moore murder on the basis of passions inflamed by the egregious facts of the Pulluru murder, especially facts relating to his gang activities. Smith points to nothing in the record, however, indicating that the jury was unable to compartmentalize the evidence with regard to each count. Furthermore, Smith's jury was specifically instructed to give separate consideration to each offense as follows:

EVIDENCE—SEPARATE CONSIDERATION FOR EACH OFFENSE

You must give separate consideration for each offense. The defendant is entitled to have his case decided on the basis of the evidence and law which is applicable to each offense. **The fact that you return a verdict of guilty or not guilty on one offense *should not, in any way, affect***

---

7. In a post-oral argument notice of supplemental authority, Smith calls our attention to two cases discussing this theory of misjoinder. Specifically, Smith refers us to *Lucero v. Kerby,* 133 F.3d 1299 (10th Cir.1998) and *United States v. Foutz,*

540 F.2d 733 (4th Cir.1976). To the extent these cases establish a cognizable constitutional theory of misjoinder, for the reasons set out in the main text, we find that Smith fails to show that he suffered this type of misjoinder.

*your verdict regarding any one of the other offenses.*

(Instruction No. 6 (citing OUJI–CR 9–6))(emphasis added). Smith does not point to anything in the record tending to show that the jury failed to follow this instruction. With nothing but a bare allegation of prejudice, and in light of the fact that the jury was specifically instructed to give separate consideration to each offense, we cannot conclude that joinder of the Moore and Pulluru murders resulted in prejudice so great as to deny Smith a fair trial.

### 3. Joinder Under 22 O.S. § 404

¶ 39 Smith also raises the prohibition of 22 O.S.2001, § 404 against alleging more than one offense in a charging information. In *State v. Lowe*, 1981 OK CR 26, ¶ 1, 627 P.2d 442, 443, this Court held that § 404 was repealed by implication with enactment of 22 O.S.1971, §§ 436 and 440 which specifically authorize joinder of separately charged offenses for trial. As discussed above, the Moore and Pulluru murders were properly joined for trial under 22 O.S.2001, §§ 436–440 as a series of criminal acts or transactions. There was no error, therefore, for charging both offenses in the same information.

### B. Arraignment by Magistrate

¶ 40 In his third proposition of error, Smith claims the trial court was deprived of authority and jurisdiction to try the case when he was formally arraigned by Magistrate Deason, a duly appointed special judge.

Smith objected to the arraignment and Magistrate–Judge Deason overruled the objection citing a local court rule requiring that arraignments be conducted by the magistrate presiding over the preliminary hearing. Because the claim raises a question of statutory interpretation, it presents a question of law we review *de novo*.[8]

¶ 41 Smith contends that 22 O.S.2001, § 451, requires that arraignments be conducted only by a district court judge; not a magistrate or special judge. Title 22 O.S. 2001, § 451 requires that:

[w]hen the indictment or information is filed, the defendant must be arraigned thereon before the court in which it is filed, if triable therein; if not, before the court to which it is removed or transmitted

Smith misconstrues this statute by mistakenly reading the term "the court" to mean district court judge. By speaking in terms of arraignment before "the court" in which an information is filed, or "the court" to which the information may have been removed or transmitted, the language of § 451 is obviously concerned with establishing the proper setting or venue for arraignment, not specifying the type of judge within a district court that may conduct the arraignment. When read in the context of its surrounding text, the term "the court" clearly refers to the unitary judicial entity specified for a particular district, not a particular type or class of judge.

¶ 42 Because nothing in our constitution or statutes expressly prohibits a special judge

8. Our sister court, the Oklahoma Supreme Court, has adopted the nearly universally accepted standard that issues of statutory interpretation present questions of law that are reviewed *de novo* (i.e., "a non-deferential, plenary and independent review of the trial court's legal ruling"). *See Heffron v. District Court of Oklahoma County*, 2003 OK 75, ¶ 15, 77 P.3d 1069, 1076. While this Court has not specifically articulated this standard, it has nonetheless consistently applied it. *See e.g., Barnard v. State*, 2005 OK CR 13, ¶¶ 5–11, 119 P.3d 203, 205–208 (performing non-deferential plenary review of defendant's claim raised in trial court concerning interpretation of prisoner escape statute at 21 O.S.2001, § 443(A)); *Messick v. State*, 2004 OK CR 3, ¶¶ 11–21, 84 P.3d 757, 760–63(performing non-deferential independent review of defendant's claim raised in trial court concerning construc-tion of general attempt statute at 21 O.S.2001, § 42 in combination with first-degree murder statute at 21 O.S.2001, § 701.7); *Howrey v. State*, 2002 OK CR 22, ¶¶ 4–13, 46 P.3d 1282, 1283–85 (finding error in trial court's interpretation of expungement statute at 22 O.S.2001, § 18 after performing independent review of statutory language); *State v. Anderson*, 1998 OK CR 67, ¶¶ 2–13, 972 P.2d 32, 33–36 (conducting plenary review of trial court's construction of statute to determine whether term "occupant" as used in 21 O.S.1991, § 1289.5 includes people other than home owner or continuous resident of premises); *Lozoya v. State*, 1996 OK CR 55, ¶¶ 12–22, 932 P.2d 22, 27–30 (remanding for resentencing after conducting independent review of trial court's interpretation of Drug Trafficking Act at 63 O.S.1991, § 2–415 and finding trial court's construction to be erroneous).

from conducting an arraignment in a criminal case and because a district court as an entity has jurisdiction over criminal cases, any judge of the district court, including a special judge, has authority to conduct an arraignment.[9] *Cf. Bowen v. State*, 1972 OK CR 146, ¶ 4, 497 P.2d 1094, 1096 ("[s]ince the district court has jurisdiction over felonies, any judge of the district court, including special judges, has authority to hear a felony case, unless expressly denied"). There was no error in Magistrate–Judge Deason conducting Smith's arraignment.

## C. *Miranda* Waiver

¶ 43 In this proposition, Smith claims his in-custody extrajudicial confession should not have been admitted as evidence because his waiver of *Miranda*[10] rights was unknowing and involuntary. Smith also claims that the district court did not apply the correct constitutional standards in evaluating whether he voluntarily and knowingly waived his *Miranda* rights.

¶ 44 To determine whether a confession is the result of free and unconstrained choice we look to the totality of the circumstances surrounding it, including the defendant's character and the details of the interrogation. *Salazar v. State*, 1993 OK CR 21, ¶ 12, 852 P.2d 729, 733. The State must prove the validity of a *Miranda* waiver by a preponderance of the evidence. *Le v. State*, 1997 OK CR 55, ¶ 7, 947 P.2d 535, 542. Where sufficient evidence supports the trial court's in camera ruling that a defendant's statements are voluntary, we will not disturb that ruling. *Id.*

¶ 45 Smith argues first that his waiver was not knowing and voluntary because police detectives affirmatively misrepresented the scope of the interrogation. Smith complains that prior to the interrogation, detectives told him they wanted to talk to him about his participation in the events surrounding a homicide near Club Lexus in Oklahoma City, not the Moore and Pulluru killings. According to Smith, this rendered his waiver of *Miranda* rights invalid with regard to the Moore and Pulluru murders because he never specifically waived *Miranda* rights with respect to those two crimes. This argument is foreclosed by our recent decision in *Coddington v. State*, 2006 OK CR 34, 142 P.3d 437. In *Coddington*, we rejected a nearly identical argument by holding that while a valid *Miranda* waiver requires that a defendant possess a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it, such full awareness does not require that the defendant be "informed of every possible offense about which [he] might be questioned." *Coddington*, 2006 OK CR 34, ¶ 33, 142 P.3d at 447. *See also Colorado v. Spring*, 479 U.S. 564, 577, 107 S.Ct. 851, 859, 93 L.Ed.2d 954, 968 (1987)(explaining that defendant's "awareness of all possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege"). Smith was informed by detectives that they wanted to talk to him about the Club Lexus homicide. That notice was sufficient.

¶ 46 Smith also argues that he was incapable of knowingly and voluntarily waiving his rights because he was under the influence of the drug Phencyclidine (PCP) at the time he was interrogated. Smith was

9. An examination of § 451 in light of relevant constitutional provisions supports this construction. The Oklahoma Constitution divides the State into judicial districts and assigns one district court for each judicial district. Okla. Const. art. VII, § 7(a). The Constitution provides that the "District Court shall have unlimited original jurisdiction of all justiciable matters." *Id.* § 7. "The Judges of the District Court shall be District Judges, Associate District Judges, and Special Judges." *Id.* § 8(a). "The jurisdiction of Special Judges shall be limited as may be prescribed by statute." *Id.* § 8(h). These provisions vest original jurisdiction of all criminal cases for state offenses in one trial court, the District Court, and all the judges of that court, including special judges. *Bowen v. State*, 1972 OK CR 146, ¶ 4, 497 P.2d 1094, 1096. Our statutes on the judiciary also support this interpretation. Specifically, 20 O.S.2001, § 91.3, provides that, unless otherwise indicated, the term "district judges" in the Oklahoma statutes includes associate district judges and special judges.

10. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

arrested at 12:27 p.m. on February 24, 2002. Detectives conducted the interview in question three days later on February 27th at 8:30 p.m. At the *Jackson v. Denno*[11] hearing held to determine the admissibility of the videotaped confession, Smith put on evidence that he was a long term PCP user. Additionally, in the interview tape itself, Smith admits to being under the influence of the drug at the time of his arrest three days earlier. The arresting officer testified that at the time of arrest, Smith appeared to be under the influence of drugs. Jailers at the Oklahoma County Jail testified that Smith appeared to be under the influence of drugs to such an extent that when he was initially processed into the facility he had to be restrained and placed in isolation. A day later, Smith was released into the general population, and the interrogation did not occur until at least one day after that. Thus, the interrogation in which Smith waived his *Miranda* rights took place three days after his arrest, and presumably, at least three days after he ingested his last dose of PCP. The interrogating officers testified that at the time of the interview, Smith did not appear to be under the influence of drugs or alcohol. The videotape of the confession interview displays a coherent Smith calmly conversing with detectives, giving rational answers to their questions, and apparently capable of understanding the *Miranda* warnings provided by the interrogating officers. This record provides more than sufficient evidence to support the district court's determination that Smith knowingly and voluntarily waived his rights under *Miranda*.[12]

¶ 47 Smith also argues that the district court failed to properly evaluate the validity of the *Miranda* waiver under the totality of the circumstances standard. Smith's specific complaint is that the judge refused to allow a neuropsychologist, Dr. Bianco, to testify at the suppression hearing

as to his [Smith's] intelligence. According to Smith, Dr. Bianco's testimony was necessary to establish that he was of low intelligence and as a result was unable to comprehend the nature or consequences of the rights he was waiving. Smith also complains that the trial judge improperly relied on her observations of him in the interrogation videotape in reaching her conclusion about his intelligence. He argues that the videotape improperly focused the attention of the judge on issues relating to his culpability rather than his ability to voluntarily waive his right to remain silent.

¶ 48 At the suppression hearing, Smith made a detailed offer of proof as to Dr. Bianco's proposed testimony. Specifically, Smith offered that Dr. Bianco would testify as to Smith's intelligence level as determined by various tests. Smith also proffered that the doctor would advise the court on his observations of the differences between Smith's conduct as depicted on the confession videotape and Smith's conduct during an interview conducted by the doctor over a year later. The Court rejected the offer of proof and ruled Dr. Bianco's testimony not relevant to the question of the validity of Smith's waiver.

¶ 49 We have reviewed the trial court's rationale for denying Dr. Bianco's testimony and agree that the proffered expert testimony was not relevant. Moreover, the numerous examples cited by the district court judge of her observations of various aspects of Smith's conduct and statements during the interview and the court's explanation of how those examples illustrated a sufficient level of intelligence convince us that the district court did not confuse the substance of the taped confession and its relevance to the issue of culpability with the substance of the tape as evidence of Smith's mental abilities. The record shows the trial court judge had sufficient evidence before her to find by a

**11.** *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964), established a defendant's right to an *in camera* hearing on the voluntariness of a confession.

**12.** In any event, even if Smith was still under some lingering effects of PCP at the time of his videotaped interview, "[s]elf-induced intoxication, short of mania, or such an impairment of the will and mind as to make the person confessing unconscious of the meaning of his words, will not render a confession inadmissible, but goes only to the weight to be accorded to it." *Coddington*, 2006 OK CR 34, ¶ 38, 142 P.3d at 448 (quoting *Moles v. State*, 1974 OK CR 57, ¶ 6, 520 P.2d 822, 824).

preponderance of evidence that Smith knowingly and voluntarily waived his *Miranda* rights. This proposition of error is denied.

### D. Jury Questions

 ¶ 50 In his fifth proposition of error, Smith claims the trial court denied his Sixth Amendment right to counsel and his right to due process when the court answered two notes from the jury deliberating in the first stage without first consulting with counsel and then bringing the jury into open court to answer the questions. In the first note, the jury asked "Is there a video tape of Marcus Berry? If so can we view it?" The trial court responded "No." In the second note, the jury asked "Are we to assess punishment at [this] time or just guilt or innocence on every charge except the 2 murder charges?" The trial court answered the question as follows: "assess punishment on all counts *except* if you find the defendant guilty of murder you will wait for the punishment stage on those 2 counts."

¶ 51 In this proposition, Smith complains that his constitutional rights to counsel and due process were violated by the trial court's failure to communicate with the jury in open court as required by 22 O.S.2001, § 894.[13] The record shows that the trial judge did indeed answer the jury's questions by return note, without consulting counsel, and without bringing the jury back into court.

 ¶ 52 When a communication between judge and jury occurs after a jury has retired for deliberations on a matter within the scope of § 894 and that communication does not comport with § 894's requirements, a presumption of prejudice arises. *Wilson v. State*, 1975 OK CR 71, ¶¶ 5–6, 534 P.2d 1325,

1327. The presumption "may be overcome if, on appeal, this Court is convinced that on the face of the record no prejudice to the defendant occurred." *Id.* Here, we agree with Smith, that the district court erred by answering the jury's questions without notice to counsel. Nevertheless, because we find that Smith was not prejudiced by the error, reversal is not warranted.

¶ 53 With regard to the trial court's answer about assessing punishment, by instructing the jury that they must assess punishment on all counts unless they found Smith guilty on the murder counts, in which case they must wait for the punishment stage on those two counts, the trial court provided the jury with a correct statement of the law. We are unable to discern how Smith was prejudiced by the jury being instructed correctly on the applicable law. We therefore find no merit in this claim.

¶ 54 The trial court's answer to the jury's question concerning the videotaped interview of Marcus Berry, however, presents a more complicated problem. Smith contends not only that the trial court's one-word answer "No" was factually incorrect with regard to the existence of the tape, but that the judge erred by answering "No" to the jury's request to review the tape.

¶ 55 The videotape in question, State's Exhibit 133 (later changed to Court's Exhibit 9), was a recording of Marcus Berry's interview with detectives. In that interview, Berry recounted various incriminating statements made to him by Smith. Portions of the tape were played for the jury during the course of Berry's testimony.[14] It appears from the trial transcript, however, that sometime prior to the jury beginning its deliberations, the prosecution and defense agreed that the ex-

---

13. 22 O.S.2001, § 894 states: "After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony or if they desire to be informed on a point of law arising in the cause, they must require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to the district attorney and the defendant or his counsel, or after they have been called."

14. There is some confusion in the record as to whether the taped excerpts were used for im-

peachment or whether they were used to refresh Berry's memory. It appears from the context surrounding each instance, that the excerpts from the tape were used to refresh Berry's memory because each time an excerpt was played, it was in response to his claim not to remember what he told police about a specific matter during the course of the taped interview. Nevertheless, because Smith asserts the videotape was used for impeachment and the State advanced the same assertion at oral argument, we assume for purposes of this appeal that the tape was used as impeachment evidence.

hibit would be withdrawn. The transcript of the proceeding, after the jury returned its verdict in the guilt phase, memorializes that earlier agreement as follows:

> THE COURT: We need to make a record in regard to State's Exhibit Number 133 pursuant to an agreement that we made at the time, which was that the State would move to withdraw that exhibit and then we would substitute in as a Court's exhibit a redacted version and I would ask you to, Mr. Siderias and Mr. Deutsch, to make such motions.
>
> MR. SIDERIAS [prosecutor]: Judge, at this time we would move to withdraw State's Exhibit Number 133. We provided the Court with, I think what's going to be marked as Court's Exhibit Number 9, a redacted version of that tape which includes those parts played for the jury. Also, I think we have marked as Court's Exhibit Number 1 the Defendant's full confession unredacted.
>
> . . .
>
> THE COURT: All right. Anything from you all in regard to the substitution on Court's Exhibit Number 9 as we previously introduced?
>
> MR. WOODYARD [defense counsel]: No, Your Honor.

(Tr. 12 at 95–96).

¶ 56 On the basis of this record, the trial court judge's decision not to consult counsel was correct because, as she understood it, counsel had already been consulted and the parties agreed the tape would be withheld from the jury. Any prejudice flowing from the jury's inability to review the tape, therefore, was the result of Smith's agreement that the tape be withdrawn. As such, the error cannot serve as the basis for reversal. *See e.g., Ellis v. State,* 1992 OK CR 45, ¶ 28, 867 P.2d 1289, 1299 (opinion on rehearing)(holding that error invited by defense counsel cannot serve as basis for reversal because defendant cannot invite error and then seek to profit from it); *Pierce v. State,* 1990 OK CR 7, ¶ 10, 786 P.2d 1255, 1259 ("[w]e have often recognized the well established principal that a defendant may not complain of error which he has invited, and that reversal cannot be predicated on such error").[15]

### E. Irrelevant and Prejudicial Evidence

¶ 57 In this proposition, Smith complains that the trial court should have excluded evidence of the Tran's Food Mart robbery as irrelevant and prejudicial under the Oklahoma Evidence Code at 12 O.S.2001 §§ 2401, 2402, and 2403. Smith complains specifically about the testimony of Mr. Han Vo, the owner of Tran's Food Mart, and of Lieutenant Dexter Nelson of the Oklahoma City

---

**15.** At oral argument, Smith elaborated on the alleged prejudice flowing from the exclusion of the tape by advancing the position that the tape was critical impeachment evidence and had Berry been discredited by it, the remainder of the State's case would have collapsed as insufficient for lack of corroborating evidence of Smith's confession, the only other evidence linking him to the Moore murder. We are not convinced Smith was prejudiced in this way, even if it is assumed the videotape was improperly withheld from the jury. Specifically, even if Berry's testimony is discounted in its entirety, Smith overlooks the testimony of Sheena Johnson. Johnson's testimony corroborated Smith's confession to police and provided the necessary linkage to the Moore murder. As noted above, Johnson testified that Smith told her that he went to Moore's apartment and killed her. He also demonstrated the manner in which he shot her, a manner consistent with the description he gave detectives during the confession interview. This testimony is sufficient to corroborate Smith's admissions to police that he committed the Moore murder. In light of Johnson's testimony, therefore, it is not possible to conclude that if the Berry videotape had been provided to jurors and had discredited Berry completely, the outcome of the trial would have been different. Because the outcome of the trial would have been unaffected, the error, if any, was harmless. Furthermore, the trial transcript shows that the State used the tape in open court to contradict statements by Berry that he could not remember certain incriminating admissions made to him by Smith. Thus, while the tape may have impeached Berry's credibility by contradicting his professed lack of memory about Smith's admissions, the portions of the tape that were played for the jury consisted of statements made by Berry to police in which he recounted statements made to him by Smith admitting to the murders. Under these circumstances, where the impeachment evidence against Berry also constituted damning substantive evidence against Smith, it is difficult to see how Smith was prejudiced by the jury being denied the ability to replay the tape in the jury room.

Police Department. Mr. Vo testified about the November 2000 robbery attempt at his convenience store in which Smith's fellow gang member, Teron "T–Nok" Armstrong was shot and killed. Lieutenant Nelson testified about his investigation into the robbery. Both witnesses testified that Tran's Food Mart was located next to the A–Z convenience store where Sarath Pulluru was killed. Mr. Vo's testimony included the fact that when Pulluru was killed, he (Vo) was at the District Attorney's office preparing for the trial of the two surviving robbers. Smith's objection to the testimony was overruled. We review a district court's evidentiary decisions for an abuse of discretion. *Williams v. State,* 2001 OK CR 9, ¶ 94, 22 P.3d 702, 724.

¶ 58 Both Smith and the State agree that Smith was not involved in the robbery attempt at Tran's Food Mart and this fact was made clear to the jury on cross-examination of each witness. Smith's confession, however, linked his actions in the Pulluru murder with the robbery attempt. Specifically, Smith admitted that he killed Pulluru because his friend "T–Nok" Armstrong was killed during the attempt and that he [Smith] was angered by what he perceived as the store owner's statements to the media about the incident that indicated disrespect toward his dead friend and gang set.

¶ 59 The Oklahoma Evidence Code at 12 O.S.2001, § 2401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Section 2402 provides that "[e]vidence which is not relevant is not admissible." Section 2403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise." The relevancy, and therefore the admissibility, of the testimony provided by Mr. Vo and Lieutenant Nelson relates directly to its value as corroborating evidence of Smith's confession.

¶ 60 For a confession to be sufficiently reliable to support a conviction, it must be supported by substantial independent evidence tending to establish its trustworthiness. *Fontenot v. State,* 1994 OK CR 42, ¶¶ 20–21, 881 P.2d 69, 77–78. In this instance, therefore, the State's burden was to provide substantial corroborating independent evidence tending to establish the trustworthiness of Smith's confession. Mr. Vo's and Lieutenant Nelson's testimony about the Tran's Food Mart robbery attempt and the killing of Armstrong confirmed facts referred to in Smith's confession. For example, Mr. Vo's testimony that his store was next door to the A–Z Mart, and that he was at the district attorney's office the Friday morning of the Pulluru murder preparing for the Monday start of the trial of the surviving would-be robbers, provided corroboration of facts relevant to Smith's statements to detectives that the Pulluru murder was motivated by events surrounding the Tran's Food Mart robbery and the death of his friend Armstrong. Mr. Vo's testimony, therefore, was highly relevant because it tended to establish the trustworthiness of Smith's confession. Similarly, Lieutenant Nelson's testimony as to his investigation of the robbery, the identities of the participants, and their linkage to the Oak Grove Posse, provided corroboration of facts referred to by Smith in his confession that were relevant to his professed motive for killing Pulluru. Because the evidence was relevant to an essential component of the State's burden of proof (i.e., corroboration of Smith's confession to establish its trustworthiness), and because the record reflects there was nothing indicating or suggesting erroneously that Smith may have been a participant in the attempted Tran Food Mart robbery, the probative value of the evidence was not substantially outweighed by a danger of unfair prejudice, confusion of the issues, or misleading the jury. The evidence was properly admitted. The district court judge did not abuse her discretion.

### F. Sufficiency of Evidence

¶ 61 In this proposition, Smith challenges the sufficiency of the evidence to support his convictions on the murder and robbery counts. We review the sufficiency of

the evidence claims in the light most favorable to the prosecution to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04 (citing *Jackson v. Virginia,* 443 U.S. 307, 316, 99 S.Ct. 2781, 2787, 61 L.Ed.2d 560, 571(1979)).

### 1. *The Moore and Pulluru Murders*

¶ 62 In challenging the sufficiency of the evidence with regard to the first-degree murder counts, Smith complains there was insufficient independent evidence presented at trial to corroborate his confession and contends that in the absence of a corroborated confession, there was insufficient evidence to sustain the convictions for the Moore and Pulluru murders. Smith also argues that inconsistencies between his confession statements and facts presented through other evidence outweighed the similarities and therefore, the confession was not sufficiently corroborated to stand as evidence against him. We find no merit in either argument.

¶ 63 We have already addressed the voluntariness of Smith's confession and whether it should have been barred as evidence through application of the exclusionary rule under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). We have also addressed the admissibility of certain evidence used to corroborate portions of the confession. In this proposition, we examine whether the confession was sufficiently corroborated to allow it to stand as evidence supporting the jury's findings of guilt.

¶ 64 As noted above, for a confession to be deemed sufficiently reliable to support a conviction, it must be supported by substantial independent evidence tending to support its trustworthiness. *Fontenot,* 1994 OK CR 42, ¶¶ 20–21, 881 P.2d at 77–78. The evidence need not establish the essential elements of the charged offense, but need only be sufficient to establish the trustworthiness of the inculpatory statements. *Fontenot,* 1994 OK

CR 42, ¶ 22, n. 10, 881 P.2d at 78, n. 10. In this instance, the record contains sufficient corroborative evidence of Smith's confession to show its trustworthiness.

¶ 65 First, Smith made two extrajudicial, post-crime statements in addition to confessing to detectives. Smith told Sheena Johnson that he went to Janet Moore's apartment looking for Phillip Zachary who he believed was a "snitch," but found only Moore who, according to Smith, began screaming in fear. In Smith's own words, he then shot Moore because "the bitch wouldn't shut up." Further, Smith told Johnson that he killed a man at the "chink" store by declaring "I murdered him ... [a]nybody f* * * with my family I murder." Smith also described how he set Pulluru and the cash register on fire. At the time he made the statements to Johnson, none of the details of the fire at the Pulluru killing had been made public, nor had the police even concluded that the two murders were linked. In a separate conversation, Smith told fellow gang member Marcus Berry that he killed Janet Moore.

¶ 66 Second, Smith's accounts of the killings were corroborated by physical evidence. Smith demonstrated to detectives how he shot Janet Moore with a single shot using only one hand, and told them that he shot Pulluru many times because he "wouldn't die." Ballistics and forensics evidence confirmed Moore was shot only once and that Pulluru had been shot multiple times with two different firearms, one of which was the same firearm used to shoot Moore. Furthermore, the locations of Moore's entry and exit wounds indicated a trajectory for the fatal bullet that was consistent with the positioning indicated by Smith's gestures as he described Moore's killing to detectives. Bullet wounds to Pulluru's forearms were consistent with wounds that would be expected based on Smith's confession account of how Pulluru raised his arms as he [Smith] fired multiple rounds at him.[16]

---

**16.** Smith also attacks the sufficiency of the corroborating evidence by complaining that there was no DNA or fingerprint evidence linking him to either scene and that no clothing or shoes linking him to the crimes were ever located. The State raises the interesting counterargument that this lack of evidence was actually additional corroborating evidence in light of Smith's state-

¶ 67 Smith also argues that the confession to detectives was untrustworthy because inconsistencies between the actual facts and facts set out in the confession statements outweighed the similarities between the two. Smith recites a list of items of evidence that he contends are inconsistent with statements he made during the course of his confession to police. While Smith does indeed identify some inconsistencies, the requirement that a confession's trustworthiness be corroborated by independent evidence does not mean that there must be no inconsistencies between the facts proven and the facts related in the confession. *Fontenot*, 1994 OK CR 42, ¶ 30, 881 P.2d at 79. Unless inconsistencies between the confession and the other evidence so outweigh the similarities, the trustworthiness and thus the credibility of the confession remains within the province of the jury. *Id.* We do not believe the inconsistencies identified by Smith impact the trustworthiness of the confession to the extent that the issue of the confession's credibility should have been removed from the jury.

¶ 68 After reviewing Smith's confession, the independent corroborative evidence, and the alleged inconsistencies, we find that when viewed in the light most favorable to the prosecution's case, the confession was sufficiently corroborated to establish its trustworthiness. On cross-examination of witnesses and during closing argument, the jury was informed of the inconsistencies between Smith's confession statements and the other evidence presented. The jury obviously chose to believe Smith's confession that he killed Moore and Pulluru. Any rational juror faced with this evidence could have found Smith guilty of both murders beyond a reasonable doubt.

### 2. *The Pulluru Robbery*

¶ 69 In addition to challenging the sufficiency of the evidence supporting the two murder counts, Smith also complains the evidence was insufficient to support his conviction on the robbery count.

¶ 70 Smith first argues there was no evidence that he took any money from the A–Z Mart and therefore there was insufficient evidence of the *corpus delicti* of the crime. This claim is belied by the record. Smith himself claimed that he took money from the store in this exchange with Detective Sterling:

Q Did you take any money or nothing [anything?] from him [Pulluru] to make it, I mean to make it for the next few days because you know you're going to be running?

A The loot, he had some loot, it was like thirty, forty dollars, I took that shit and I gave that shit to one of my little nephews or something . . . Like my little nephews, I gave it to them.

(State's Exhibit 85). This admission was corroborated by testimony by the store's owner who, while not specifying a specific dollar amount, indicated a discrepancy existed between the amount of money he had in the cash register when he closed the store the night before and the amount of money that was eventually recovered from the cash register after the early morning robbery-homicide. The existence of some quantity of missing cash, coupled with Smith's admission that he took some cash from the store provides a sufficient evidentiary basis from which a rational jury could find beyond a reasonable doubt that Smith took the property of another.

¶ 71 Smith argues further that even if there was sufficient evidence he took money from the store, that evidence in itself is insufficient to support a robbery conviction because other elements of the offense were not satisfied. According to Smith, the evidence did not indicate one way or the other whether Pulluru was dead or alive at the time of the taking of the cash. Therefore, he argues even if it is assumed that Pulluru was still alive, but unconscious at the time of the theft, taking property from an unconscious person without force or fear is not robbery unless the unconsciousness was produced expressly for the purpose of taking the proper-

---

ments that he had: (1) wiped down Moore's apartment to remove fingerprints; (2) set the fires at the A–Z Food Mart to destroy evidence;

and (3) had gang member friends dispose of his clothes.

ty from that person. This argument presupposes incorrectly that a person can only have one reason for doing anything. Because a person may be motivated by multiple reasons for performing any single act, as long as the evidence indicates that at least one of the reasons for rendering a person unconscious is to take property from that person, the evidence is sufficient to support a robbery conviction.

¶ 72 Smith also contends that the evidence showed force was not used against Pulluru with the intent to take money from him. Smith asserts instead that the money was taken as an "afterthought" to the use of force. According to Smith, because the money was taken as an "afterthought," the intent to steal did not arise until Pulluru was unconscious or dead and therefore, a robbery did not occur. We rejected this same "afterthought" argument in *Diaz v. State*, 1986 OK CR 167, ¶¶ 5–7, 728 P.2d 503, 508–509, where we held that under Oklahoma's statutory definition of robbery, the use of force (i.e., killing) may precede, coincide with, or follow the taking of property and as a result, the taking of property, even as an "afterthought" to a killing still constituted robbery. *Id.*

¶ 73 Here, Smith was charged under 21 O.S.2001, § 801 with robbery with dangerous weapon. Section 801 incorporates the definition of robbery as set out at 21 O.S.2001, § 791. Section 791 defines robbery as

a wrongful taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear.

In this instance, the money was taken from Pulluru's presence as he lay on the floor behind the cash register, either dead or dying from gunshot wounds inflicted by Smith. In that state, Pulluru could not consent to the taking. Furthermore, the store owner testified that he did not authorize Smith to remove money from the store. Under these circumstances, the money was taken wrongfully and against Pulluru's will because by Smith's own admission, force was used, although application of that force preceded the taking and arguably preceded the formation of the intent to steal. Therefore, regardless of whether robbery was Smith's sole reason for using force, or whether robbery was one of several reasons, or whether the intent to take the money was formed merely as an "afterthought" to the murder, there was more than sufficient evidence from which the jury could conclude beyond a reasonable doubt that each of the elements of robbery as set out in 21 O.S.2001, §§ 801 and 791 were satisfied.

## III. SECOND STAGE ISSUES

### A. Aggravating Circumstance: Heinous, Atrocious, or Cruel

¶ 74 In proposition eight, Smith claims there was insufficient evidence for the jury to find beyond a reasonable doubt that either murder was especially heinous, atrocious, or cruel because: (1) the evidence indicated that death occurred quickly with each victim and, therefore, there could have been no conscious physical suffering; and (2) neither victim was terrorized for a significant period of time before death and, therefore, the victims did not suffer great physical anguish or the effects of extreme mental cruelty prior to death. We review the sufficiency of the evidence of an aggravating circumstance in the light most favorable to the State to determine whether there was any competent evidence supporting the State's charge that the aggravating circumstance existed. *Jones v. State*, 2006 OK CR 5, ¶ 97, 128 P.3d 521, 549, *cert. denied*, —— U.S. ——, 127 S.Ct. 404, —— L.Ed.2d —— (2006).

¶ 75 To establish that a murder was especially heinous, atrocious, or cruel, the State must produce evidence indicating the victim's death was preceded by conscious physical suffering, torture, or serious physical abuse. *Hogan v. State*, 2006 OK CR 19, ¶ 66, 139 P.3d 907, 931, *cert. denied*, —— U.S. ——, 127 S.Ct. 994, 166 L.Ed.2d 751 (2007); *Smith v. State*, 1996 OK CR 50, ¶ 42, 932 P.2d 521, 535. Torture and serious physical abuse include the infliction of great physical anguish or extreme mental cruelty. *Myers v. State*, 2006 OK CR 12, ¶ 74, 133 P.3d 312, 331–32. In this instance, there was competent evidence supporting the heinous, atro-

cious, or cruel aggravating circumstance for each victim.

¶ 76 With regard to Janet Moore, the evidence showed that Smith kicked open the front door to her apartment, then kicked in an interior door into her bedroom. The sounds of raised voices, overheard by a neighbor, indicated a struggle occurred between Moore and Smith and that the confrontation lasted five to ten minutes before the neighbor heard a loud "pop." Smith also told Sheena Johnson that once inside Moore's apartment, Moore started screaming and he shot her because "the bitch wouldn't shut up." Smith's own words to Detective Sterling, indicated that Moore was "panicked" by his presence and that she called out for help before he shot her. Additionally, the medical examiner testified that a single bullet entered Moore's left chest and exited her lower back. He explained that due to the nature of the internal injuries caused by the gunshot, death would not have been instantaneous and Moore could have survived at least for several minutes in a partially conscious state. According to the medical examiner, the fatal injuries (i.e., a ruptured artery near the heart and a punctured left lung) were likely very painful. This evidence in its totality is sufficient to support a fair inference of physical anguish, mental cruelty, or conscious physical suffering.

¶ 77 With regard to Sarath Pulluru, the evidence showed Pulluru had been shot nine times and that death was not instantaneous. Smith himself provided a key piece of evidence on this point by telling detectives that

he shot Pulluru so many times because "He wouldn't die. Mother-f* * * * * wouldn't die, you know what I'm saying. It's, like, he wouldn't go." Smith's statement about Pulluru surviving the barrage of bullets is buttressed by the medical examiner's testimony indicating that that none of the nine gunshot wounds would have killed Pulluru instantaneously and that Pulluru likely would have lingered for at least a minute or longer. Common sense, as well as the medical examiner's expert testimony, indicates that nine gunshot wounds would have been painful. This evidence supports a fair inference that Pulluru experienced conscious physical suffering before he died, and supports the jury's finding that Sarath Pulluru's murder was especially heinous, atrocious, or cruel.

**B. Aggravating Circumstance: Continuing Threat to Society**

¶ 78 In his ninth proposition, Smith contends that the use of unadjudicated offenses to prove he posed a continuing threat to society violated the Eighth and Fourteenth Amendments of the United States Constitution as well as Article II, Section 9 of the Oklahoma Constitution. In this proposition, Smith argues generally that the use of unadjudicated offenses as evidence of continuing threat violates these constitutional provisions because such evidence is inherently inflammatory and unfairly prejudicial and therefore permits a jury to impose a death sentence arbitrarily and capriciously.[17] This Court has repeatedly rejected this

---

17. Despite his lengthy complaint of error, in which he argues against use of unadjudicated acts in general, Smith does not identify a single unadjudicated offense that was used improperly as evidence of continuing threat in his case. Rather, Smith simply refers the Court to a three-hundred page span in the transcript of the sentencing phase of the trial, apparently assuming we would sift these pages to locate, identify, and analyze the allegedly offending evidence for him. Although not obliged to do so, we have reviewed these pages and indeed have identified specific unadjudicated violent acts that were offered by the State to support the continuing threat aggravating circumstance. Our review produces the following non-exhaustive list: (1) several incidents with police in which Smith placed officers or others at risk through reckless driving; (2) struggling with a police officer in an attempt to

take the officer's firearm while the officer was trying to arrest him for carjacking; (3) striking a police officer while fleeing arrest; (4) chambering a round and handing his own firearm to another person who then shot and wounded a rival gang member and killed a bystander; (5) discharging all the ammunition from a handgun while shooting a fellow gang member and then using the empty weapon as a club to strike another gang member in the head with such force that the resulting injury required fourteen staples to close. We find that this evidence was more than sufficient to support the jury's verdict of the existence of a probability that Smith would commit violent criminal acts that would pose a continuing threat to society. We also note that evidence of the callous nature of a crime and the defendant's blatant disregard for the importance of human life also supports this aggravator.

argument and upheld the constitutional validity of using evidence of unadjudicated violent acts to support the continuing threat aggravator. *Jones*, 2006 OK CR 5, ¶ 94, 128 P.3d at 549; *Fitzgerald v. State*, 2002 OK CR 31, ¶ 15, 61 P.3d 901, 905–06; *Lockett v. State*, 2002 OK CR 30, ¶ 34, 53 P.3d 418, 428–29; *Wackerly v. State*, 2000 OK CR 15, ¶ 52, 12 P.3d 1, 17. Nonetheless, Smith urges this Court to depart from this precedent for the reasons stated by Judge Chapel in his dissent in *Paxton v. State*, 1993 OK CR 59, ¶¶ 2–9, 867 P.2d 1309, 1334–36 (Chapel J. dissenting). We decline to revisit this issue now and hold that use of unadjudicated acts in this case passes constitutional muster and that use of such evidence is relevant to determining whether a defendant is likely to commit future acts of violence constituting a continuing threat to society.

#### C. Aggravating vs. Mitigating Circumstances

▓▓▓▓▓▓ ¶ 79 In his tenth proposition of error, Smith contends that his due process right to a trial by jury was violated by the trial court's failure to instruct the jury that the death penalty could not be imposed unless the jury first found that aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt. Smith requested a jury instruction concerning the beyond reasonable doubt standard and that request was denied by the trial court. The determination of which instructions will be given to a jury is a matter entrusted to the discretion of the trial court. *Cipriano v. State*, 2001 OK CR 25, ¶ 14, 32 P.3d 869, 873. Absent an abuse of discretion, this Court will not reverse if the instructions as a whole accurately state the applicable law. *Id.*

¶ 80 This claim is a reformulation of the often-raised argument based on the United States Supreme Court's holdings in *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153

L.Ed.2d 556 (2002); *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). As Smith acknowledges, this Court has repeatedly rejected this claim. *See Rojem v. State*, 2006 OK CR 7, ¶ 60, 130 P.3d 287, 299; *Davis v. State*, 2004 OK CR 36, ¶ 45, 103 P.3d 70, 83; *Torres v. State*, 2002 OK CR 35 ¶ 6, 58 P.3d 214, 216; *Murphy v. State*, 2002 OK CR 32, ¶¶ 22–25, 54 P.3d 556, 565–66. These cases effectively resolve this issue. The instruction given by the trial court accurately stated the law. The trial court did not abuse its discretion and Smith's right to due process was not violated.

### IV. CUMULATIVE ERROR

¶ 81 In his eleventh proposition, Smith contends the cumulative effect of errors in his case requires reversal of his convictions or modification of his sentences. Because we have examined each of Smith's allegations in detail and found but one error, an error that was in itself harmless, there is no accumulation of error to review. Accordingly, relief is not warranted on this claim.

### V. MANDATORY SENTENCE REVIEW

▓▓▓▓▓ ¶ 82 In accordance with 21 O.S.2001, § 701.13(C), we must determine whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and whether the evidence supports the jury's finding of aggravating circumstances. The jury found the existence of the following aggravating circumstances: (1) that each murder was especially heinous, atrocious, or cruel; and (2) a probability existed that Smith would commit acts of violence that would constitute a continuing threat to society. We have already considered each of these aggravators and deter-

---

*Jones*, 2006 OK CR 5, ¶ 97, 128 P.3d at 549–50. The record shows that such evidence was presented to the jury during the guilt phase of the trial. Specifically, upon being told by Sheena Johnson that he had mistakenly killed Janet Moore believing she was Phillip Zachary's aunt, not his mother, Smith simply shrugged and said "oh well." Additionally, Smith told Johnson that he shot and killed Moore merely because "the

bitch wouldn't shut up." With regard to Sarath Pulluru, Smith explained to detectives that he unloaded everything he had from his two hand-guns into Pulluru because "He wouldn't die. Mother-f* * * * * wouldn't die you know what I'm saying. It's, like, he wouldn't go." These statements standing alone demonstrate the callous nature of each crime and thus a blatant disregard for the value of human life.

mined the evidence sufficiently supported each. Upon review of the record, we cannot say the sentence of death was imposed because the jury was influenced by passion, prejudice, or any other arbitrary factor contrary to 21 O.S.2001, § 701.13(C). After carefully weighing the aggravating circumstances and all mitigating evidence, we find the aggravating circumstances outweigh the mitigating evidence and that the sentence of death is factually substantiated and appropriate.

## VI. DECISION

¶ 83 We find no error warranting either reversal of Smith's convictions or modification of his sentences. Accordingly, the Judgment and Sentences imposed in Oklahoma County District Court Case Number CF–2002–1329, are **AFFIRMED.** Under Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2006), the **MANDATE** is **ORDERED** issued upon delivery and filing of this decision.

LUMPKIN, P.J., C. JOHNSON, V.P.J., and CHAPEL, J.: Concur.

LEWIS, J.: Concur in Results.