**Sarinrak SATTAYARAK, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–92–180.

Court of Criminal Appeals of Oklahoma.

Sept. 30, 1994.

Order Denying Rehearing
Nov. 29, 1994.

Gene Stipe, Robert K. McCune, Oklahoma City, for appellant, at trial and on appeal.

Frank Muret, Asst. Dist. Atty., Paul R. Anderson, Dist. Atty., Stillwater, for appellee, at trial.

James A. Belote, Oklahoma City, for appellant, on appeal.

Susan B. Loving, Atty. Gen., Sandra D. Howard, Asst. Atty. Gen., Oklahoma City, for appellee, on appeal.

### OPINION

CHAPEL, Judge:

Sarinrak Sattayarak was tried by jury and convicted of First Degree Manslaughter in violation of 21 O.S.1983, § 711, before the Honorable Donald L. Worthington in the District Court of Payne County, Case No. CRF–90–69. She was sentenced to twenty-five years incarceration. Sattayarak has perfected her appeal of this conviction.

Sattayarak, a citizen of Thailand, came to Oklahoma in 1988 to study in the English Language Program at Oklahoma City University and obtain a graduate degree. While at OCU she began dating Kimihiru Tsumura, a Japanese graduate student also enrolled in the OCU English Language Program. The two had a stormy relationship during which the Village and Oklahoma City police responded to several domestic disturbance calls; they lived together for a few months and continued to date after moving to separate apartments. Sattayarak returned to Thailand for a month in late 1989. Tsumura testified that they did not date after that, but Sattayarak evidently still considered him her boyfriend.[1] Tsumura met Chiharu Tango, another Japanese citizen studying at OCU, in January 1990. Sattayarak was jealous of Tango but testified that they became friends after Tango and Tsumura convinced her there was no romantic relationship (Gifu Kawabata testified that Tango told him shortly before she died that she was afraid of Sattayarak).[2] In mid-February Sattayarak moved to a neighborhood she described as dangerous and where she was afraid of her neighbors. On February 20,[3] she bought a four-shot .22 derringer to keep in her purse. She told several people, including Tsumura, that she had bought the gun for protection. Tsumura told Tango that Sattayarak had a gun.

On February 27, 1990, Tsumura and Tango ate an early supper and studied together until shortly before he left at 6:00 p.m. Tsumura called Tango and spoke with her about 6:15; he attempted to call again around 7:00 p.m. but reached her answering machine (which had an unusual "extra" message in Japanese saying she had to go out but would be back in five minutes). Sattayarak said she had given Tango a letter for Tsumura earlier that day, and she went to Tango's apartment between 6:30 and 7:00 to hear his response (Sattayarak had difficulty reaching Tsumura and believed Tango would see him). Sattayarak and Tango left the apartment to drive and talk; Tango drove Sattayarak's rental car because Sattayarak was upset. They drove north on Interstate 35 to the Mulhall exit, turned around on a muddy dirt

---

1. Sattayarak was a virgin before the relationship and became intimate when Tsumura promised to marry her. At his request, before her visit to Thailand she allowed a videotaping of them engaged in intercourse. Testimony at trial regarding her efforts to retrieve the videotape was offered by the State to show she had previously broken the law where Tsumura was concerned. The defense offered testimony to show the nature of her relationship with Tsumura and the cultural conflicts she experienced as a result.

2. During an encounter at the YMCA on February 13, 1990, Sattayarak and Tsumura argued about Tango. When Tango attempted to intervene, Sattayarak called her a bitch, Tango attacked Sattayarak's throat, a fight ensued and Sattayarak blackened Tango's eye.

3. The State's brief erroneously says the gun was purchased on February 27, the day of the homicide. A review of the record and the receipt (State's Exhibit 4A) clearly show the date of purchase as February 20.

and gravel road, and parked. Sattayarak testified she told Tango she thought she was pregnant. Tango began to argue. Then Sattayarak called Tango fat and ugly, and Tango attacked her, grabbing Sattayarak's hair and throat. Sattayarak said she pointed the gun at Tango, turned her head, closed her eyes and fired four times, hitting Tango in the head and chest. Two of the wounds were fatal. Sattayarak pulled Tango's body out of the car, drove to Oklahoma City and found Tsumura. She confessed to Tsumura. They attempted to find the body and finally called police.

After thorough consideration of the entire record before us on appeal, including the original record, transcripts, exhibits, and briefs of the parties, we have determined that the law and the evidence warrant reversal on Propositions II and IV, and additional error occurred in Propositions III and V. Because relief is warranted only under these propositions we will not address Propositions I, VI, VII and VIII.

■ In Proposition II Sattayarak claims that the trial court should have suppressed her statement to Officer George Disel because she had invoked her Fifth Amendment right to counsel during custodial interrogation. The State concedes that Sattayarak had invoked her right to counsel in Oklahoma City before Disel transported her and that Disel knew it. When the Fifth Amendment right to counsel is invoked, the defendant is not subject to further questioning unless defendant has counsel or reinitiates interrogation with law enforcement personnel.[4] Once counsel has been requested, questioning must cease and officers may not initiate contact without counsel present whether or not a defendant has consulted with counsel.[5] Custodial interrogation equals both express questioning and any words or actions by

police that they should know are reasonably likely to elicit an incriminating response; the focus is on the defendant's perception, not an officer's intent.[6] Interrogation is reinitiated when a defendant represents a desire to open up a more generalized discussion relating directly or indirectly to a criminal investigation: routine inquiries arising from the incidence of custodial relationship, such as requests for a telephone or drink of water, do not reinitiate questioning after a defendant has invoked the right to counsel.[7]

■ The Supreme Court's Fifth Amendment cases clearly show that the word "initiate" is a term of art in this context and does not mean "who talks first". After a night spent talking to several police officers and after she had been handcuffed, removed from jail, put in a car with yet another officer, and as the car began to move away from the police station, Sattayarak asked where they were going. The State argues, and the trial court erroneously agreed, that in asking where they were going Sattayarak initiated Disel's subsequent interrogation. Her inquiry was eminently reasonable and cannot be construed as an invitation to discuss any aspect of the investigation. In response, Disel not only told her their destination but also asked if she had made statements to any officers from Stillwater—a question which certainly appears to contemplate that Sattayarak might give further statements to this Stillwater officer. Sattayarak began to speak but, before she could say anything, Disel stopped her and administered *Miranda* warnings. The State's contention that Disel did not intend to interrogate Sattayarak may be disregarded, as the focus of this inquiry is the perception of the defendant, not the intent of the officer. In any event, Disel went on to ask whether Sattayarak would answer his questions and make a statement.[8] Assuming Sattayarak subsequently waived her

4. *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

5. *Minnick v. Mississippi,* 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990).

6. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

7. *Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

8. The State's cited cases are easily distinguishable. In *Fox* the officers specifically told the defendant they did not want to discuss the case, and he called them back as they left. *Fox v.*

*Miranda* rights, that waiver was the result of police-initiated questioning and is not valid.

■ This error is not harmless under *Chapman v. California*,[9] and the issue presents the Court with a clear violation of Sattayarak's Fifth Amendment right to have counsel present at any police interrogation. We do not suggest that such a violation may never be harmless, but we cannot say that the admission of such a clearly inadmissible statement is harmless in this case.

■ Sattayarak claims in Proposition IV that the trial court erred in admitting the color photographs depicting Tango's head and chest wounds. State's Exhibits 16, 17 and 18 are color post-autopsy photographs clearly and graphically showing the autopsy Y-incision, very crudely stitched with open gaps of one to two inches between each stitch. *Oxendine v. State*[10] is directly on point. In *Oxendine*, this Court held that post-autopsy photographs which showed crudely sutured incisions were wholly inadmissible in the form presented and that their admission was an abuse of discretion by the trial court; the autopsy incisions were not the handiwork of the defendant, were highly prejudicial and could only serve to arouse the passions of the jury, and forced a reversal.[11] There, as here, the defendant admitted the shooting and no controversy existed as to the cause of death. There, as here, the photographs could have been limited to pictures of the wounds without showing the incisions

(the photographs admitted to show Tango's head wounds need not have shown the autopsy incisions at all, and the chest wound was far enough away from the incisions to have those portions of the photograph excised). In addition, the medical examiner prepared and Sattayarak introduced into evidence three charts showing the exact locations of Tango's wounds which corroborated the medical examiner's report.

The State correctly notes that it must prove both the corpus and that the defendant committed the crime, but its cited cases are distinguishable. Here, there is no issue as to cause of death, and in the State's cited cases the defendants deny committing the crimes. The State correctly notes that evidence will be relevant and admissible if it tends, with other evidence, to establish a material fact in issue, but fails to recognize that neither the corpus, cause of death, nor identity of the shooter were at issue in this trial. The State is right in arguing that *Oxendine* does not always control the admission of photographs and that it is based on particular facts; the State's subsequent cited cases do not involve post-autopsy photos, and *Oxendine's* particular facts exactly match the facts here. This Court has consistently held that photographs which show forces other than the handiwork of the defendant may be irrelevant, prejudicial and inadmissible.[12] The admission of State's Exhibits 16, 17, and 18 did not assist the jury, could only have inflamed the jury's

---

*State*, 779 P.2d 562 (Okl.Cr.1989), *cert. denied*, 494 U.S. 1060, 110 S.Ct. 1538, 108 L.Ed.2d 777 (1990). *Battenfield* presents a Sixth Amendment problem where the defendant engaged in unsolicited conversation with an officer during trial recesses. *Battenfield v. State*, 816 P.2d 555 (Okl. Cr.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1491, 117 L.Ed.2d 632 (1992).

**9.** 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

**10.** 335 P.2d 940, (Okl.Cr.1958).

**11.** *Oxendine*, 335 P.2d at 943.

**12.** *See, e.g., Harless v. State*, 759 P.2d 225, 227 (Okl.Cr.1988) (photos depicted victim's injuries only slightly exacerbated by post-injury antemor-

tem surgery); *Jones v. State*, 738 P.2d 525, 529 (Okl.Cr.1987) (victim in advanced stage of decomposition from one month underwater); *Tobler v. State*, 688 P.2d 350, 355 (Okl.Cr.1984) (victims in advanced stage of decomposition). These cases complement 12 O.S.1991, § 2403, which provides that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of, among other things, unfair prejudice. Section 2403 was promulgated in 1978. In *Oxendine* and the cases that follow, this Court's analysis focuses on whether photographs are gruesome as a result of the defendant's crime, or as a result of intervening medical procedures or forces of nature. This Court has held that in the latter circumstances the evidence has very little if any probative value.

passions and prejudices, and necessitates reversal.[13]

⬛ In Proposition III Sattayarak complains of improper remarks of the District Attorney during closing argument. Sattayarak did not object to closing argument at trial and has thus waived review for all but plain error.[14] In the space of a few paragraphs the State tells the jury it has all the evidence "permissibly available", "allowable", "what we could bring", and "what the law permits you to view". This appears to suggest to the jury that other evidence existed which would have provided grounds for a guilty verdict. Sattayarak cites Eleventh Circuit and Fifth Circuit cases which hold this type of argument to be error. These comments also appear to contravene Oklahoma law which prohibits the State from arguing evidence not admitted at trial and improperly bolstering testimony. The State claims that these comments were invited by Sattayarak's closing argument, in which counsel makes six references noting specific pieces or types of evidence were not produced (primarily counsel argued that the State had produced no evidence that the shootings were not in self-defense). While the State does have considerable latitude to respond to invited argument, the response above at best skirts the bounds of impropriety. However, given the evidence presented,

Sattayarak has not shown she was prejudiced by the comments and this error, on its own, would not require reversal.

⬛ In Proposition V Sattayarak argues the trial court erred in allowing the State to introduce evidence of other crimes. Specifically, Sattayarak complains of Tsumura's testimony regarding two previous violent incidents between him and Sattayarak [15] and the fight between Tango and Sattayarak at the YMCA.[16] A defendant should be convicted, if at all, by evidence only of the charged offense and not by evidence of similar offenses.[17] Although evidence of other crimes is strictly limited and looked on with suspicion, it may be admissible to show, among other things, intent, motive, identity of the perpetrator, common scheme or plan, and absence of mistake or accident; there must be a visible connection between the crimes and the evidence must be necessary to support the State's burden of proof.[18] Other crimes evidence should not be used where it is so prejudicial it denies a defendant his right to be tried only for the offense charged.[19]

⬛ Evidence of another crime may be used to show a motive or intent. This is particularly true where the evidence involves some sort of altercation between the defen-

---

13. Sattayarak also complains that the photographs should not have been admitted because she did not receive them until the beginning of the second day of trial, in violation of both the trial court's discovery order (O.R.265) and *Allen v. District Court of Washington County*, 803 P.2d 1164 (Okl.Cr.1990). The State clearly violated *Allen* and the trial court order, which required each side to disclose all photographs intended for use at trial ten days before the pre-trial hearing. The State's only excuse was that the photographs were not developed until shortly before trial; this is unpersuasive as the medical examiner's office had the film, and it had been in the State's constructive possession since February 28, 1990. The trial court refused to exclude the photos as a sanction, but did delay the start of the trial until that afternoon so defense could review the photographs. Sattayarak's renewed objection at trial was overruled.

14. *Fontenot v. State*, 881 P.2d 69, 85 (Okl.Cr. 1994).

15. On September 25, 1989, Sattayarak chased Tsumura and tried to hit him with her car. On January 26, 1990, she ran over his motorcycle.

16. The State filed a pretrial *Burks* notice informing Sattayarak it intended to use this evidence to show intent. *Burks v. State*, 594 P.2d 771 (Okl. Cr.1979). Sattayarak's motion in limine to exclude the evidence was denied; she then renewed her objection at trial as to the first incident with Tsumura only. Sattayarak has thus waived review of all but plain error regarding the second and third incidents. *Luna v. State*, 829 P.2d 69 (Okl.Cr.1992).

17. *See, e.g., Roulston v. State*, 307 P.2d 861 (Okl. Cr.1957).

18. 12 O.S.1981, § 2404(B); *Burks v. State*, 594 P.2d 771 (Okl.Cr.1979).

19. *Turner v. State*, 629 P.2d 1263 (Okl.Cr.1981).

dant and the victim.[20] The evidence regarding the YMCA fight between Sattayarak and Tango is clearly relevant to prove motive or intent. However, as to both of the incidents concerning Tsumura, Sattayarak was angry because she suspected him of involvement with an ex-girlfriend in Japan. This does not appear probative of any issue at trial and should not have been admitted.[21] However, given the other evidence, this probably did not affect the outcome of the trial and is not reversible error.

In summary, a review of the record before us reveals that errors in Propositions II and IV, together with accumulated error in Propositions III and V, require reversal.

Sattayarak's Judgment and Sentence is **REVERSED** and the case is **REMANDED** for a new trial not inconsistent with this opinion.

LUMPKIN, P.J., JOHNSON, V.P.J., and LANE and STRUBHAR, JJ., concur.

### *ORDER DENYING PETITION FOR REHEARING*

Sarinrak Sattayarak was tried by jury and convicted of First Degree Manslaughter (21 O.S.1983, § 711) before the Honorable Donald L. Worthington in the District Court of Payne County in case number CRF–90–69. She was sentenced to twenty-five years incarceration.

By its September 30, 1994, published opinion, this Court reversed Sattayarak's conviction and remanded the case for retrial. The State is now before the Court on a Petition

for Rehearing, Rule 3.14, *Rules of the Court of Criminal Appeals,* 22 O.S.Supp.1993, Ch. 18, App. According to Rule 3.14, a Petition for Rehearing shall be filed for two reasons only:

(1) That some question decisive of the case and duly submitted by the attorney of record has been overlooked by the Court, or

(2) That the decision is in conflict with an express statute or controlling decision to which the attention of this Court was not called either in the brief or in oral argument. In its Petition for Rehearing the State raises one proposition which fails to meet the criteria set forth in Rule 3.14.[1] Accordingly, this proposition will not be addressed.

**IT IS THEREFORE THE ORDER OF THE COURT** that the Petition for Rehearing is **DENIED.**

**IT IS SO ORDERED.**

/s/ Gary L. Lumpkin
GARY L. LUMPKIN
Presiding Judge

/s/ Charles A. Johnson
CHARLES A. JOHNSON
Vice–Presiding Judge

/s/ James F. Lane
JAMES F. LANE
Judge

/s/ Charles S. Chapel
CHARLES S. CHAPEL
Judge

/s/ Reta M. Strubhar
RETA M. STRUBHAR
Judge

---

**20.** *Revilla v. State,* 877 P.2d 1143 (Okl.Cr.1994); *Brown v. State,* 753 P.2d 908 (Okl.Cr.1988); *Lamb v. State,* 767 P.2d 887 (Okl.Cr.1988); *Wadley v. State,* 553 P.2d 520 (Okl.Cr.1976).

**21.** *Cook v. State,* 704 P.2d 86 (Okl.Cr.1985) is distinguishable; Cook's threats to a man he suspected of having an affair with his wife (the victim) were admissible to show intent under the State's theory that Cook killed the victim in part due to infidelity. Here, Sattayarak's attacks

sparked by jealousy of an ex-girlfriend might show intent for an attack on Tsumura.

**1.** The State argues that the Court's decision conflicts with *Davis v. United States,* 512 U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Although *Davis* was not decided when the case was briefed, this Court was aware of and considered that decision in determining the issues in Sattayarak's appeal. This Court's opinion is not in conflict with *Davis* or any other express statute or controlling decision.