2012 OK CR 7

**John Fitzgerald NELOMS, Jr., Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–2009–1124.**

Court of Criminal Appeals of Oklahoma.

March 28, 2012.

Malcolm Savage, Lydia Green, Oklahoma City, OK, attorneys for defendant at trial.

Greg Mashburn, District Attorney, Jennifer Austin, Assistant District Attorney, Norman, OK, attorneys for State at trial.

S. Gail Gunning, Norman, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Oklahoma Attorney General, Jay Schniederjan, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

A. JOHNSON, Presiding Judge.

¶ 1 Appellant John Fitzgerald Neloms, Jr. was tried by jury in the District Court of Cleveland County in Case No. CF–2007–1812, for First Degree Rape in violation of 21 O.S.2001, § 1114(A)(3) (Count 1), and First Degree Rape by Instrumentation in violation of 21 O.S.Supp.2007, § 1111.1 (Count 2).[1] The jury found Neloms guilty and imposed a sentence of life imprisonment on each count. The trial court sentenced accordingly and ordered that the sentences be served consec-

---

**1.** The judgment and sentence document states erroneously that Neloms was convicted of Rape in the First Degree in violation of "21 O.S. § 1111.1" (O.R. 391). This error is discussed in the main text below.

utively. From this Judgment and Sentence Neloms appeals, raising the following issues:

(1) whether the admission of certain other crimes evidence or bad acts was improper and unfairly prejudiced him;

(2) whether he was denied a fair trial by the improper admission of false and inflammatory testimony regarding alleged injuries to the prosecutrix;

(3) whether his sentences are excessive and should be favorably modified; and

(4) whether cumulative error deprived him of a fair trial.

¶ 2 We find reversal is not required and affirm the Judgment and Sentence of the District Court.

### FACTS

¶ 3 In the early morning hours of November 21, 2007, four-year-old B.N. was sleeping on the floor of her family's living room in an apartment in Norman, Oklahoma. Her siblings and parents were asleep in their respective bedrooms. B.N.'s mother allowed B.N. to sleep in the living room because B.N. was suffering from an ear infection and had finally fallen asleep there.

¶ 4 Around 3:00 a.m., B.N. went into her parents' bedroom in her shirt and underwear crying and screaming that someone had hurt her. After lifting B.N. into the bed, B.N.'s mother noticed blood on B.N.'s panties and blanket, her feet, left leg, and the carpet. B.N. was taken to Norman Regional Hospital by ambulance and then transferred to Children's Hospital in Oklahoma City where she was sedated for a sexual assault examination.

¶ 5 B.N. had an abrasion on the inside of her upper lip and red marks on her back and abdomen. There was bruising and swelling of the vaginal area. She also had bleeding from her injuries that included a tear in the labia, fissures around the clitoris, a laceration below the vaginal canal opening, and tears inside the vaginal canal. The hymen was not intact.

¶ 6 During a forensic interview conducted the day after the assault, B.N. told her interviewer that her attacker was black and that he "pinched her pee with his fingers," "punched her pee with his pee," and his "pee went inside her pee." During another forensic interview, B.N. picked out a photograph of Neloms without hesitation from a photo lineup by circling his picture with a crayon. She also identified Neloms at the preliminary hearing, but was unable to identify him at trial. At trial, B.N. testified that she circled the photograph in the photo lineup because she was sure that the photograph depicted the person who hurt her.

¶ 7 DNA samples obtained from B.N. during the sexual assault examination could not exclude Neloms as the donor, and the partial DNA profile that was detected in these samples was estimated to occur in approximately 1 in 793 African–Americans.

¶ 8 A nearby neighbor of B.N.'s family testified that he was returning to his apartment between 3:00 and 3:20 a.m. on the morning of November 21st when he heard a door close and then saw a man with a pony tail running away. Several witnesses testified that Neloms wore his hair in a pony tail at the time. Travis Kramer, a former friend of Neloms, testified that in a telephone conversation with Neloms, Neloms told him, among other things, that "I should have killed you and that little girl" (State's Exhibit 2; Kramer Tr. at 54).

¶ 9 Testimony of various witnesses placed Neloms in B.N.'s apartment complex throughout the evening of November 20, 2007. Neloms's girlfriend testified that despite Neloms asking her to tell police that he was with her all night, she last saw Neloms at 7:00 p.m. on November 20th when she dropped him off at the apartment complex where B.N. lived. Another friend of Neloms testified that Neloms left her apartment in that apartment complex at 1:00 a.m. on the morning of November 21st.

¶ 10 At trial, the State introduced evidence about an unrelated burglary at a residence of the Hofmann family in Norman, Oklahoma, a year-and-a-half earlier. In that case, the Hofmanns were asleep in their bed when an intruder entered their home. The intruder turned on the Hofmanns' computer and used it to conduct internet searches and view images of young girls in sexually suggestive poses and clothing. By following the history

of web sites visited, the internet searches stored on the computer, and information from an image that had jammed in the Hofmanns' printer, police printed copies of some of the images that the intruder had viewed. Some of these images were introduced as evidence at trial.[2]

¶ 11 The intruder had obviously masturbated in front of the computer screen because semen was found on the computer keyboard and table. An OSBI criminalist testified that the DNA extracted from the semen on the computer table matched Neloms's DNA profile. The trial court judge allowed the State to introduce the Hofmann burglary evidence as evidence of a common scheme and plan that was relevant to proving the identity of B.N.'s attacker.

## DISCUSSION

### 1.

### Evidence of Other Crimes, Wrongs, or Acts

■ ¶ 12 Neloms claims that evidence showing that he broke into the Hofmann home a year-and-a-half earlier and masturbated in front of a computer screen to images of young girls was improperly admitted as evidence of other crimes, wrongs, or acts. This Court reviews a trial court's decision to allow introduction of evidence of other crimes for an abuse of discretion. *Williams v. State*, 2008 OK CR 19, ¶ 36, 188 P.3d 208, 218.

¶ 13 The State defends the admission of the Hofmann evidence, as it did in the district court, by arguing that the evidence was admissible under 12 O.S.Supp.2007, §§ 2413 and 2414. Section 2413 provides in part that

[i]n a criminal case in which the defendant is accused of an offense of sexual assault, evidence of the defendant's commission of another offense or offenses of sexual *assault* is admissible, and may be considered for its bearing on any matter to which it is relevant.

2. State's Exhibit 54 contained sixty 1.5 x 1.25 inch images of young girls from the web site at

12 O.S.Supp.2007, § 2413(A) (emphasis added). Similarly, Section 2414 provides in part that

[i]n a criminal case in which the defendant is accused of an offense of child molestation, evidence of the defendant's commission of another offense or offenses of child *molestation* is admissible, and may be considered for its bearing on any matter to which it is relevant.

12 O.S.Supp.2007, § 2414(A) (emphasis added). It is obvious from the plain language of these two statutory provisions, however, that the Hofmann evidence was not admissible under either section. These two sections permit introduction of evidence of other sexual *"assaults "* or instances of child *"molestation."* Masturbation in front of a computer monitor displaying images of children is neither sexual assault, nor molestation of a child. The Hofmann evidence was therefore not admissible under either Section 2413 or Section 2414.

■ ¶ 14 Anticipating a finding that the Hofmann evidence was not admissible under Section 2413 or Section 2414, the State argues next that the evidence was, as the trial court concluded, admissible under 12 O.S. 2001, § 2404(B), as probative of Neloms's identity in the instant offense because it was part of a common scheme and plan. According to the State, the trial court's decision to allow evidence of the prior break-in under the common scheme and plan exception was correct because the two crimes are factually similar thereby making the Hofmann evidence probative of Neloms's identity as the perpetrator of the crimes against B.N. By making this argument, the State improperly conflates the identity exception to 12 O.S. § 2404(B), which requires unique similarities between the crimes amounting to a "signature," with the common scheme and plan exception, which requires a relatedness between the crimes such that the other crime paved the way for the current offense or the second offense is dependent on the first. *Owens v. State*, 2010 OK CR 1, ¶ 14, 229 P.3d 1261, 1266–1267; *see also, Williams*, 2008

http://teeny-list.com.

OK CR 19, ¶ 38, 188 P.3d at 219 ("[e]vidence that the defendant committed another crime is admissible to show identity under the common scheme or plan exception when the previous crime prepares the way for another and the second crime is dependent on the commission of the first"); *James v. State*, 2007 OK CR 1, ¶ 3, 152 P.3d 255, 257 (holding that for other crimes evidence to be admissible under the common scheme and plan exception, "[t]here must be a visible connection between the other crimes evidence and the charged crimes").

¶ 15 Understanding that the common scheme and plan exception requires the two crimes to be related, the evidence in this case did not support a finding that the break-in at the Hofmann residence was part of a common scheme and plan that led to B.N.'s rape. That is, there is no evidence that B.N.'s rape was in any way dependent on, or facilitated by, the break-in at the Hofmann residence a year-and-a-half earlier. Lacking any dependence or facilitation nexus, the two crimes were independent of each other. Furthermore, while the entries to both dwellings were surreptitious nighttime entries to dwellings while the adult occupants slept, the entries were over a year apart, involved different victims at different locations, and most importantly, one involved a sexual attack against a child, while the other did not. While both of these crimes may have had some superficial similarities as nighttime burglaries of occupied dwellings, "[s]imilar, but independent crimes are not admissible." *Owens*, 2010 OK CR 1, ¶ 15, 229 P.3d at 1267.

¶ 16 Nevertheless, this Court has recognized that separate offenses characterized by a "highly peculiar method" of operation suffice to show a common scheme because a "highly peculiar method" may constitute a unique signature that goes to the identity exception of Section 2404(B). *Owens*, 2010 OK CR 1, ¶ 16, 229 P.3d at 1267; *Williams*, 2008 OK CR 19, ¶ 37, 188 P.3d at 219. Although, as noted above, there is some similarity between the instant offense and the Hofmann incident, there is no unique element in either crime that might be deemed a "signature" that uniquely identifies Neloms as the perpetrator in both. In one instance,

Neloms broke into a residence at night while its occupants slept in order to masturbate in front of a computer screen. In the other, he surreptitiously entered a residence at night and raped a child while the adult occupants of the residence slept. Nothing about either entry distinguishes it from any other run-of-the-mill burglary, and nothing about the acts committed in the Hofmann residence or B.N.'s apartment (masturbation to images of children versus rape of a child) are so similar that they rise to the level of a signature that uniquely identifies the perpetrator in both instances as the same person.

¶ 17 Because the evidence of the Hofmann break-in satisfies neither the common scheme and plan, nor the identity exceptions to 12 O.S.2001, § 2404(B), the trial court abused its discretion by allowing the evidence at trial. *Owens*, 2010 OK CR 1, ¶¶ 14–16, 229 P.3d at 1266–1267.

¶ 18 Determining that the admission of the Hofmann evidence was erroneous, however, does not end our inquiry. This Court will not reverse a conviction for improper admission of other crimes evidence if it finds that introduction of the evidence was harmless beyond a reasonable doubt. *Stouffer v. State*, 2006 OK CR 46, ¶¶ 65–67, 147 P.3d 245, 263–264; *Sattayarak v. State*, 1994 OK CR 64, ¶ 12, 887 P.2d 1326, 1332. "Where the weight of the rest of the evidence is overwhelming and the prejudicial effect of the inadmissible evidence is insignificant, the error may be viewed as harmless." *Mayes v. State*, 1994 OK CR 44, ¶ 67, 887 P.2d 1288, 1307 (citing *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969)). In other words, where there is error, the jury verdict can be upheld only where this Court finds "the error did not influence the jury, or had a very slight effect." *Simpson v. State*, 1994 OK CR 40, ¶ 36, 876 P.2d 690, 702 (quoting *Kotteakos v. United States*, 328 U.S. 750, 764–765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)).

¶ 19 In this instance, the trial evidence showed that B.N. unhesitatingly and unambiguously identified Neloms from a photographic lineup within days of the attack, and that she identified him in court during

the preliminary hearing. Also, while discussing the incident with a former friend, Neloms told the friend: (1) "I was f——ed up"; (2) "I didn't mean to"; and (3) "I should have killed you and that little girl." Additionally, Neloms told another friend to tell police that he was with her all night, but when confronted by police with the nature of the alleged crime, the friend told police that she last saw Neloms between 6:00–7:00 p.m. on the night of the assault. Neloms himself told police he was with the friend all night until she called and told him his "alibi was busted."

¶ 20 Furthermore, Neloms could not be excluded as a donor of DNA found on vaginal swabs from B.N., or on her underwear. With regard to DNA retrieved from the underwear, the partial DNA profile that was detected was estimated to occur in approximately 1 in 793 African–Americans. Lastly, at the time of the attack, Neloms wore his hair in a ponytail, and one of B.N.'s neighbors testified that at approximately 3:00 a.m. on the morning of the attack, he heard a noise like a closing door coming from B.N.'s family's apartment and then saw a man with a ponytail running away. It was shortly thereafter that a bleeding and crying B.N. woke her parents seeking help. Given the strength of this identity evidence, it is unlikely that the jury would have reached a different result as to guilt even if the Hofmann evidence had been excluded. The error was harmless.

¶ 21 Neloms also claims that evidence of his previous contacts with police was improper evidence of other crimes that was erroneously allowed in violation of 22 O.S. 2001, § 860.1.[3] Specifically, Neloms complains about a portion of his second interview

with police in which he stated that he had "been locked up before," and a portion of his third interview with police in which the interrogating officer said Neloms was "not going to get a slap on the wrist this time." Defense counsel objected to both statements and requested a mistrial for each.

¶ 22 With regard to the first statement, prosecutors agreed before trial that the statement would be redacted from the recording played for the jury. It was inadvertently left in, however, and played for the jury. The trial judge found that the statement was fleeting and that she barely "picked up on it." Neloms refused the trial judge's offer of a curative instruction admonishing jurors to disregard the statement. Nevertheless, believing that an admonishment to the jury was necessary, but recognizing that to instruct jurors immediately after the playing of the recorded interview would draw more attention to the error, the judge later instructed jurors to disregard any statements Neloms made concerning "any possible prior legal entanglements." Additionally, the copy of the recording that was provided to jurors for their use during deliberations had the allegedly offending statement redacted.

¶ 23 It is not at all clear how Neloms's statement that he had "been locked up before," violates 22 O.S.2001, § 860.1. Section 860.1 governs the procedure for presenting evidence of prior convictions in a case where the defendant is charged with committing a crime as a prior-convicted felon. Neloms was not charged as a former felon, and his statement that he had "been locked up before" was not in itself evidence of any former felony conviction. *See Bear v. State,* 1988 OK CR 181, ¶ 22, 762 P.2d 950, 956 ("[t]he

---

3. Title 22 O.S.2001, § 860.1 states:
 In all cases in which the defendant is prosecuted for a second or subsequent offense, except in those cases in which former conviction is an element of the offense, the procedure shall be as follows:
 1. The trial shall proceed initially as though the offense charged was the first offense; when the indictment or information is read all reference to prior offenses shall be omitted; during the trial of the case no reference shall be made nor evidence received of prior offenses except as permitted by the rules of evidence; the judge shall instruct the jury only on the offense charged; the

jury shall be further instructed to determine only the guilt or innocence on the offense charged, and that punishment at this time shall not be determined by the jury; and
 2. If the verdict be guilty of the offense charged, that portion of the indictment or information relating to prior offenses shall be read to the jury and evidence of prior offenses shall be received. The court shall then instruct the jury on the law relating to second and subsequent offenses, and the jury shall then retire to determine the fact of former conviction, and the punishment, as in other cases.

mere suggestion of another crime, without more, will not trigger the general rules regarding the admission of other crime evidence"). Neloms presents neither argument nor authority to support this claim. The claim is waived. *See Lott v. State*, 2004 OK CR 27, ¶ 169, 98 P.3d 318, 358 ("we will not review allegations of error that are neither supported in the record or by legal authority"); *Frederick v. State*, 2001 OK CR 34, ¶ 30, 37 P.3d 908, 923 (" 'It is necessary for counsel … not only to assert error, but to support his contentions by both argument and the citations of authorities' ") (quoting *Bowers v. State*, 1982 OK CR 103, ¶ 17, 648 P.2d 835, 838).[4] Similarly, Neloms claims that a portion of his third interview with police in which the interrogating officer said Neloms was "not going to get a slap on the wrist this time" was also improper evidence of other crimes, wrongs, or acts. Neloms also casts this as a violation of 22 O.S.2001, § 860.1 without any supporting authority or explanation. This claim is waived. *See Lott*, 2004 OK CR 27, ¶ 169, 98 P.3d at 358; *Frederick*, 2001 OK CR 34, ¶ 30, 37 P.3d at 923.[5]

### 2.

### Testimony about the Extent of the Victim's Injuries

■ ¶ 24 Neloms claims that jurors heard false testimony about the extent of B.N.'s injuries. Neloms contends that this testimony violated his constitutional rights to due process and a fair trial. Neloms complains

specifically about a portion of Travis Kramer's testimony in which Kramer stated:

> Somebody told me that [B.N.] wasn't able to have kids. She was internally wounded beyond the point of healing and she had caught gonorrhea and Chlamydia [objection]

(Kramer Tr. 52; State's Exhibit 2). Kramer's videotaped testimony was admitted by agreement of the parties. Neloms objected to the statement during the recorded testimony and at trial. The trial court judge overruled both objections.

■ ¶ 25 Neloms does not argue that Kramer's statement was inadmissible hearsay. Rather, he argues that because the testimony was not corroborated by medical testimony, it was false and because the statement was false, it was by definition not relevant to any issue at trial. As a result of the admission of this allegedly false, irrelevant, and inflammatory evidence, Neloms contends his due process rights were violated by the prosecution's failure to redact the statement from the videotaped testimony or disclose to the jury the falsity of the testimony (Aplt's Brief 38–39, 40). This Court reviews a trial court's evidentiary rulings for an abuse of discretion. *Williams v. State*, 2001 OK CR 9, ¶ 94, 22 P.3d 702, 724; *Welch v. State*, 2000 OK CR 8, ¶ 30, 2 P.3d 356, 370.

¶ 26 Neloms relies on *Hall v. State*, 1982 OK CR 141, 650 P.2d 893, for the proposition that the State has a duty to disclose the

---

4. Nevertheless, even if we assume that admission of the statement was error, the error, if any, does not warrant reversal. This Court may set aside a jury verdict or remand for a new trial for misdirection of the jury, or any matter of pleading or procedure, only if it is the opinion of the Court that the error complained of has probably resulted in a miscarriage of justice or constitutes a substantial violation of a constitutional or statutory right. 20 O.S.2001, § 3001.1. In this instance, the single fleeting statement made by Neloms during the five hours of recorded interviews played for the jury, when weighed against the remaining substantial evidence of guilt, and considered in light of the remedial steps taken by the judge to admonish the jury and redact the exhibit that was provided to jurors during their deliberations, can hardly be viewed as so prejudicial as to have affected Neloms's substantial right to a fair trial, or to have caused a miscarriage of justice.

5. Even if Neloms had cast this claim as one of improper evidence of other crimes or wrong acts in violation of 12 O.S.2001, § 2404(B), the claim still fails. This statement, while suggestive that Neloms may have had other legal entanglements in the past, was not in itself evidence of other crimes or wrongful acts. Its admission as evidence, therefore, was not error. *Cf. Banks v. State*, 2002 OK CR 9, ¶ 24, 43 P.3d 390, 398–399 (finding that prosecutor's statement was not inadmissible evidence of other crimes where he told jurors that defendant had given statement to "get out of trouble" because statement was mere suggestion that did not inform jury that defendant had committed any other crime); *Bear*, 1988 OK CR 181, ¶ 22, 762 P.2d at 956 ("[t]he mere suggestion of another crime, without more, will not trigger the general rules regarding the admission of other crime evidence").

falsity of perjured testimony to jurors, and the State's failure to do so in this instance constituted reversible error. Specifically, Neloms relies on that portion of *Hall* which states:

> It is well established that the State's knowing use of perjured testimony violates one's due process right to a fair trial. Due process demands that the State avoid soliciting perjured testimony, and imposes an affirmative duty upon the State to disclose false testimony which goes to the merits of the case or to the credibility of the witness.

*Hall,* 1982 OK CR 141, ¶ 16, 650 P.2d at 896–897 (internal citations omitted). Neloms's reliance on *Hall* is misplaced.

¶ 27 When the snippet of allegedly false testimony cited by Neloms is reviewed within the full context in which it was rendered, it is obvious that it did not constitute evidence of a false fact (i.e., that B.N. suffered permanent injuries and contracted sexually transmitted disease), and that it was relevant to an issue at trial (i.e., Kramer's credibility). Specifically, Kramer testified on direct examination as follows:

Q. What about your last phone call with him?

A. Before—before the phone call happened, somebody told me that [B.N.] wasn't able to have kids. She was internally wounded beyond the point of healing and she had caught gonorrhea and Chlamydia.

MR. SAVAGE: Objection your Honor. I'm going to ask the Court to strike that, those references to—

MS. AUSTIN: And I will clear that up.

A. This—she—

THE COURT: I am going to reserve my ruling. And we can redact the tape before playing to the jury, if necessary, as to that. Continue. And I'll reserve that.

Q. (By Ms. Austin) Was there a lot of rumors flying around the complex?

A. Yes. Yeah.

Q. And did you learn that some of those weren't true?

A. I learned later that some of those weren't true.

A. And was this the kind of complex, too, where somebody might say something, and by the time it made it to four more people, it had grown into something a lot bigger than it was?

A. Yes, all of the time.

Q. So when you were hearing things around the complex, you didn't know what was true and what wasn't?

A. You know, I was a little more young and more hotheaded, so I tended to believe that everything I heard was true.

Q. So you heard these things, but you didn't know for sure they were true, but that's what you believed at the time?

A. Yes.

Q. Because you believed that, what did you do?

A. I snapped on him. I said, I am going to kill you.

Q. Is that in person or on the phone?

A. On the phone.

Q. What did he say back to that?

A. He kept saying—first, he kept saying, I'll kill you and your brother. Right before he hangs up, he says, I should have killed you and that little girl.

Q. And so what were you planning on doing at that point?

A. I had a .22 rifle at the time. I was going to meet up with him and shoot him.

Q. You were very angry with him, would that be safe to say?

A. Yes.

(Kramer Tr. 52–54; State's Exhibit 2)

¶ 28 This lengthy excerpt shows that Kramer made the statement about B.N.'s injuries in the context of explaining the circumstances of his third and final telephone conversation with Neloms. Specifically, Kramer explained how the perceived injuries to B.N. angered him and drove him to threaten Neloms, and it was this threat that provoked Neloms into making the incriminating statement that "I should have killed you and that little girl." It is clear from the prosecutor's questions, and Kramer's responses to them, therefore, that Kramer was simply testifying about how his mistaken belief about the nature of B.N.'s injuries drove

him to threaten Neloms, and how that threat elicited Neloms's incriminating response. Had this information been redacted from Kramer's videotaped testimony, as Neloms claims it should have been, Kramer's testimony about the conversation would have made little sense to jurors and would have deprived them of the context necessary to evaluate Kramer's credibility.

¶ 29 Furthermore, given the way the prosecutor framed the questions about rumors in the apartment complex, and Kramer's responses to them, it is obvious that the prosecutor was disclosing, through Kramer's own testimony, that the statement about B.N.'s injuries was untrue. Thus, to the extent that Kramer's statement about B.N.'s injuries might be considered a false statement (i.e., perjury), the falsity of the statement was disclosed by the prosecutor through her questions about the spread of false rumors throughout the apartment complex. Within this context, therefore, given the way the prosecutor framed the matter in the questions she put to Kramer, no reasonable juror would have understood Kramer's testimony to be evidence that B.N. had been injured to the point of not being able to bear children or that she had contracted a sexually transmitted disease from her attacker.

¶ 30 Considering the context within which it was rendered, Kramer's statement about the nature of B.N.'s injuries was evidence of what motivated him to elicit the incriminating statement from Neloms. It was not evidence of the actual nature or extent of B.N.'s injuries, and no reasonable juror should have understood it that way. As evidence of Kramer's motivation, the evidence was relevant to Kramer's credibility, and therefore, its admission did not violate Neloms's due process rights. The trial court did not abuse its discretion by allowing this testimony into evidence. *See e.g., Warner v. State*, 2006 OK CR 40, ¶ 26, 144 P.3d 838, 861 (finding that any error arising from failure to redact from videotape of detective's interrogation of child-victim's mother the detective's comment that victim had broken leg was cured when prosecutor elicited testimony from detective on direct examination that he mistakenly thought doctors said victim had broken leg).

### 3.

### Excessive Sentence

¶ 31 Neloms raises several arguments in support of a claim that his sentence is excessive. Neloms contends first that improperly admitted evidence of other crimes caused the jury to impose an excessive sentence. Neloms complains specifically that the Hofmann burglary evidence prejudiced the jury's sentencing deliberations.

¶ 32 As discussed above, the Hofmann burglary evidence was erroneously admitted, but given the strength of the remaining evidence of guilt, the error was harmless with respect to the finding of guilt. With respect to sentencing, the error is similarly harmless.

¶ 33 In the case of evidentiary error, the proper inquiry to determine if relief is required is whether this Court has "grave doubts" that the outcome of the trial would have been materially affected had the error not occurred. *Mitchell v. State*, 2005 OK CR 15, ¶ 38, 120 P.3d 1196, 1207; *Douglas v. State*, 1997 OK CR 79, ¶ 45, 951 P.2d 651, 667. In this instance, given the heinous nature of the crimes committed against four-year-old B.N., and given the comparatively minor nature of the acts committed at the Hofmann residence, we harbor no grave doubt that had the Hofmann evidence not been presented, the jury still would have returned life sentences on both counts.

¶ 34 Neloms also complains that Travis Kramer's testimony that B.N. had been injured to the point of not being able to have children and having contracted a sexually transmitted disease from her attacker also influenced the jury to impose an excessive sentence. As discussed above, this evidence was properly admitted as relevant to Kramer's credibility, and was presented to the jury in such a way as to make clear that while Kramer believed the information to be true at the time, he had later come to believe that it was just an unfounded rumor. Other than his bald assertion of prejudice stemming from this testimony, Neloms offers no evidence or argument to support his claim that

Kramer's testimony on this point caused jurors to escalate his sentence on either count from some term of years to a term of life imprisonment.

¶ 35 Neloms complains further that the trial court erred by ordering that his two life sentences be served consecutively because the trial judge relied on other crimes evidence (e.g., the Hofmann burglary, drug and alcohol usage, and other contacts with law enforcement). This Court reviews a trial court's decision to run a defendant's sentences consecutively or concurrently for an abuse of discretion. *See Kamees v. State*, 1991 OK CR 91, ¶ 21, 815 P.2d 1204, 1208–1209 ("Whether sentences are to be served consecutively or concurrently is a decision resting in the sound discretion of the trial court. Therefore, when the trial court's decision to run two sentences consecutively is challenged on appeal, this Court reviews the trial court decision only for an abuse of discretion") (internal citations omitted). An abuse of discretion is any unreasonable or arbitrary action taken without proper consideration of the facts and law pertaining to the matter at issue. *Cuesta–Rodriguez v. State*, 2010 OK CR 23, ¶ 19, 241 P.3d 214, 225. An abuse of discretion has also been described as "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." *Stouffer*, 2006 OK CR 46, ¶ 60, 147 P.3d at 263 (internal citation and quotation marks omitted).

¶ 36 In this instance, based on the judge's explanation of her sentencing decision, we find this complaint unfounded. The judge's explanation from the bench made clear that while she was aware of the Hofmann burglary and Neloms's other crimes and acts, she found that those activities "pale in comparison to the predatory, monstrous, brutal behavior you committed to [B.N.]" Following this statement, the judge then went on to say:

And I—I don't know how you get around that [referring to the monstrous brutal behavior against B.N.]. I don't know how you get around that. I hope that there is redemption, like your dad talked about, for you. But those are all part of your choices. It is completely outside my ability to give you those things or provide them for you, because of your choices.

I hope that you do make a covenant with God. And I hope that you do minister. But you will minister in the community that you have chosen. And by your behavior, you have chosen that community to be outside of free society.

As much as I hope for these things for you, I am afraid of you. And everyone in this room is afraid of monsters like you. People that come into their homes and rape their babies.

I have for weeks tried to figure out what I am going to do with this sentencing today; for weeks. It weighs on me. I thought about you during the trial. I have thought about you almost every day since. Jurors in this courtroom that went through this process and struggled with that think about what do we do.

And we look at rehabilitation. We look at punishment. We look at community safety when we talk about what we are going to do with your sentencing. And I can't get past the first one, which is the community safety. My world is not safe with you in it. And that's a frightening thing.

So, Mr. Neloms, it is the judgment and sentence of this Court that you be sentenced to life sentences on both counts, and that those sentences will run consecutive with each other.

(Sentencing Tr. 14–15).

¶ 37 It is apparent from these comments, that while the judge considered other crimes evidence in her decision to run Neloms's life sentences consecutively, she ultimately made the decision based on her concerns for community safety that arose from the sheer heinousness of Neloms's crimes in the instant case. The judge's concerns for community safety were well supported by the evidence that Neloms committed a brutal rape of a near-infant child who he randomly selected as his victim. As a reasoned decision supported by the evidence, the judge's decision to run the sentences consecutively was not an abuse of discretion.

¶ 38 Lastly, Neloms argues that the trial judge's decision to run his sentences consecu-

tively converted the life sentences imposed by the jury into a sentence of life imprisonment without possibility of parole, an option the jury clearly rejected. According to Neloms, this effective sentence of life in prison without possibility of parole is excessive because the jury's choice of life, versus life without possibility of parole, indicated that the jury wanted him, as a "teen-aged" defendant, to have a very long sentence, but with "at least some light at the end of the tunnel" (Aplt's Brief 44).

 ¶ 39 This Court will not modify a sentence within the statutory range "unless, considering all the facts and circumstances, it shocks the conscience." *Rea v. State,* 2001 OK CR 28, ¶ 5 n. 3, 34 P.3d 148, 149 n. 3. In this instance, the sentences rendered by the jury (two life sentences) and the total term of imprisonment imposed by the judge by running the sentences consecutively (effectively imposing a sentence of life without parole), are all within the correct statutory range. Despite Neloms's alleged youthful age, and given the proven facts that he brutally and callously raped a four-year-old child, an especially vulnerable and defenseless victim, the total term of imprisonment imposed by the trial judge does not shock our conscience.

## 4.
## Cumulative Error

¶ 40 In his last proposition, Neloms claims that an accumulation of error denied him a fair trial and produced an excessive sentence. Given that we have found just one error (improper admission of evidence of the Hofmann burglary), and that error was harmless with regard to both the jury's guilt and sentencing determinations, there is no accumulation of error upon which to base a finding of cumulative error. This claim is denied. *See*

*Smith v. State,* 2007 OK CR 16, ¶ 81, 157 P.3d 1155, 1179 ("[b]ecause we have examined each of Smith's allegations in detail and found but one error, an error that was in itself harmless, there is no accumulation of error to review").

## 5.
## Judgment & Sentence Error

¶ 41 Finally, we take notice of one matter not raised by the parties, a matter that requires a correction to the judgment and sentence document.

¶ 42 The charging information alleges in Count 1 that Neloms committed Rape in the First Degree in violation of "21 O.S. § 1111.1" and the judgment and sentence document mirrors this by stating that Neloms was convicted of Rape in the First Degree in violation of "21 O.S. § 1111.1" (O.R. 87, 391).[6] Title 21 O.S.Supp.2007, § 1111.1 governs Rape by Instrumentation, however, and by its very specific language excludes rape by penetration amounting to sexual intercourse, the very act that was alleged in Count 1.[7] By alleging an act of sexual intercourse involving penetration with a penis, Count 1 alleged Rape, not Rape by Instrumentation.

¶ 43 In this instance, the jury was instructed on first degree rape as follows:

No person may be convicted of rape in the first degree unless the State has proved beyond a reasonable doubt each element of the crime. These elements are:

*First,* sexual intercourse;

*Second,* with a person who was not the spouse of the defendant;

*Third,* where force/violence was used against the victim.

6. Title 21 O.S.Supp.2007, § 1111.1 states in relevant part that
[r]ape by instrumentation is an act within or without the bonds of matrimony in which any inanimate object or any part of the human body, not amounting to sexual intercourse is used in the carnal knowledge of another person without his or her consent and penetration of the anus or vagina occurs to that person.

7. Count 1 alleged that

on or about the 21st day of November, 2007, in Cleveland County, State of Oklahoma, said defendant committed the crime of FIRST DEGREE RAPE, a felony, by having sexual intercourse involving vaginal penetration with one B.M.N. (DOB: 8–17–03), by placing his penis in her vagina, contrary to the form of the Statutes in such cases made and provided and against the peace and dignity of the State of Oklahoma. (O.R. 87).

(O.R. 23). The third element of this instruction tracks the language of the first degree rape statute which states in relevant part that

Rape in the first degree shall include:

. . .

3. rape accomplished with any person by means of force, violence, or threats of force or violence accompanied by apparent power of execution regardless of the age of the person committing the crime.

21 O.S.2001, § 1114(A)(3).

¶ 44 In light of the instructions given to the jury and the way the instruction tracked the language of the first degree rape statute, it is obvious that Count 1 meant to allege a violation of 21 O.S.2001, § 1114(A)(3) (Rape in the First Degree), not a violation of 21 O.S.Supp.2007, § 1111.1 (Rape in the First Degree by Instrumentation). Clearly then, the references to 21 O.S. § 1111.1 in the charging information and judgment and sentence document are scrivener's errors with respect to Count 1. Accordingly, the district court will need to enter an order *nunc pro tunc* correcting the Judgment and Sentence to reflect that Neloms's conviction in Count 1 was for a violation of 21 O.S.2001, § 1114(A)(3). *See Head v. State,* 2006 OK CR 44, ¶ 30, 146 P.3d 1141, 1149 (holding that erroneous judgment and sentence must be corrected by order *nunc pro tunc,* because the record must accurately reflect the charge that is the basis for conviction).

## DECISION

¶ 45 The Judgment and Sentence of the district court is **AFFIRMED.** Nevertheless, this case is **REMANDED** to the district court for correction of the Judgment and Sentence document, through an order pro tunc, to reflect that Neloms's conviction in Count 1 was for Rape in the First Degree in violation of 21 O.S.2001, § 1114(A)(3). Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2012), the **MANDATE** is **ORDERED** issued upon delivery and filing of this decision.

LEWIS, V.P.J., and C. JOHNSON, and SMITH, JJ.: concur.

LUMPKIN, J.: concur in results.

LUMPKIN, Judge, concurring in result.

¶ 1 I concur in the Court's decision to affirm the Judgment and Sentence and remand this matter for an order *nunc pro tunc* to correct the Judgment and Sentence document. However, I disagree with the Opinion's discussion of the other crimes evidence which was admitted pursuant to 12 O.S.2001, § 2404(B).

¶ 2 The Opinion engages in the business of weighing the similarities of the two offenses against the dissimilarities which this Court denounced in *Williams v. State,* 2008 OK CR 19, 188 P.3d 208. As I stated in my separate writing in *Owens v. State,* 2010 OK CR 1, 229 P.3d 1261:

While the opinion cites to *Williams v. State,* 2008 OK CR 19, 188 P.3d 208 and quotes a sentence that seems to confirm the opinion's analysis, it disregards the substance of the Court's analysis and decision in *Williams.* The Court actually found the evidence of the prior robbery in *Williams* was admissible § 2404(B) evidence to prove identity. In doing so the opinion pointed out the Court had previously considered this same issue in *Pickens v. State,* 1988 OK CR 35, 751 P.2d 742. In both cases the Court analyzed the methods utilized to commit the robberies. As a part of that analysis the Court stated in *Williams:*

This Court should not be in the business of weighing the similarities against the dissimilarities. When there are enough similarities between the two crimes to support the trial court's decision, then we must give deference to the trial court's decision. Once that threshold is met, any differences in the two crimes go to the weight of the evidence and not to the admissibility.

2008 OK CR 19, ¶ 44, 188 P.3d at 220.

That is what the Court should have done in this case. If that analysis had been done, it would reflect the evidence should have been admitted in that the facts relating to

the similarities of the two crimes in this case are the mirror images of the factual analysis in *Williams* and *Pickens*. When the evidence in these three cases is reviewed side by side, there is no reason why the evidence was admissible in the first two cases, but not the present case. An objective analysis can make no reasonable distinction between the admissibility of the evidence in each of the three cases. Trying to make that distinction is like trying to strain a gnat's hair to find a discernable difference. Instead of engaging in that type of verbal gymnastics we should apply the straight forward, common sense approach the Court set out above in *Williams*. I would find the other crimes evidence properly admitted.

*Id.,* 2010 OK CR 1, ¶¶ 3–4, 229 P.3d 1261, 1269–70 (Lumpkin, J., concurring in part/dissenting in part).

¶ 3 Turning to the present case, the trial court did not abuse its discretion in admitting evidence concerning the burglary of the Hofmanns' home. *Eizember v. State,* 2007 OK CR 29, ¶ 99, 164 P.3d 208, 234. Analyzing the present case pursuant to the rule set forth in *Williams* "there are enough similarities between the two crimes to support the trial court's decision." *Williams,* 2008 OK CR 19, ¶ 44, 188 P.3d at 220. In both instances, Appellant burglarized an apartment home in Norman, Oklahoma. Both burglaries occurred during the night. Appellant was able to gain entry into both apartment homes without waking the sleeping occupants of the home. Appellant burglarized both homes so he could engage in sexual conduct relating to a minor child or children. In the Hofmann burglary, Appellant viewed photographs of minor females in sexually suggestive poses and ejaculated on the Hofmanns' desk and computer while the Hofmanns slept.[1] In the charged offense, Appellant raped a minor female while her parents slept.

¶ 4 As both burglaries were accomplished upon apartment homes at night with the utmost stealth and punctuated with sexual conduct towards a female child or children,

there are enough similarities between the two crimes to support the trial court's decision. The trial court did not abuse its discretion in admitting the other crimes evidence and this Court need not determine whether admission of the evidence was harmless.

---

1. I note that the definition of "sexual conduct" includes both "[a]cts of masturbation" and "[a]cts of excretion in a sexual context." Inst. No. 4–139, OUJI–CR(2d) (Supp. 2010); 21 O.S. 2001, § 1024.1.