HUDSON, J., DISSENTING:
¶1 This is a shocking crime. Appellee is accused of breaking into the home of a schoolmate, C.T., in the middle of the night while C.T.'s family was sleeping then fatally shooting C.T.'s mother in the head and shooting C.T. in both arms. After being shot, C.T. fell to the floor where he was promptly kicked in the head. C.T. squinted his eyes and pretended to pass out but was still able to see his attacker towering overhead while pointing the gun at C.T. for a brief time. The evidence shows these offenses were premeditated, carried out in a manner to avoid detection and were prompted by little more than Appellee's brooding dislike of C.T. The State's evidence too reveals Appellee's troubling history of violence directed towards C.T. and other classmates prior to the onslaught he unleashed inside C.T.'s home.
¶2 The State presented evidence showing that Appellee had numerous school suspensions for fighting in the 2016-2017 school year. One of those fights was witnessed by Paul Pankhurst, an assistant school principal. Pankhurst observed Appellee ambush K.G. in the school cafeteria and punch the boy in the face. On another occasion, Appellee slapped C.T. in the face after a school assembly. In a separate incident, Appellee was found in possession of a Taser at school. Appellee was eventually suspended for the rest of the school year after attacking another student. During this incident, Appellee waited outside the school cafeteria for the student then pushed past two others so he could hit the boy. When given the opportunity to lessen this last school suspension, Appellee's mother told Pankhurst "she did not believe that she could keep [Appellee] from fighting again. So it was ... the rest of the year."
¶3 The Legislature must have envisioned a defendant like Appellee when it enacted the current statutory scheme for juvenile offenders charged with first degree murder. At age fourteen years and four months, Appellee was presumed to be an adult under Oklahoma law when the charged offenses were committed. See 10A O.S.2011, § 2-5-205(A) ("Any person thirteen (13) or fourteen (14) years of age who is charged with murder in the first degree shall be held accountable for the act as if the person were an adult; provided, the person may be certified as a youthful offender or a juvenile as provided by this section...."). The State charged Appellee as an adult in this case. Appellee subsequently filed a motion for certification as a juvenile or, in the alternative, as a Youthful Offender.
¶4 At a reverse certification hearing, it is Appellee's burden to overcome the presumption and prove that he should be certified as either a child or as a youthful offender. C.L.F. v. State , 1999 OK CR 12, ¶ 4, 989 P.2d 945, 946. Title 10A O.S.2011, § 2-5-205(E) directs that when ruling on a motion for certification as a youthful offender or juvenile, that the court shall consider the following seven guidelines with greatest weight to be given to the first three listed:
1. Whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;
2. Whether the offense was against persons, and, if personal injury resulted, the degree of personal injury;
3. The record and past history of the accused person, including previous contacts with law enforcement agencies and juvenile or criminal courts, prior periods of probation and commitments to juvenile institutions;
4. The sophistication and maturity of the accused person and the capability of distinguishing right from wrong as determined by consideration of the person's psychological evaluation, home, environmental situation, emotional attitude and pattern of living;
5. The prospects for adequate protection of the public if the accused person is processed through the youthful offender system or the juvenile system;
6. The reasonable likelihood of rehabilitation of the accused person if such person is found to have committed the alleged offense, by the use of procedures and facilities currently available to the juvenile court; and *776 7. Whether the offense occurred while the accused person was escaping or on escape status from an institution for youthful offenders or delinquent children.
Id .
¶5 In the present case, Judge Weedon granted Appellee's motion for certification as a Youthful Offender. "Absent an abuse of discretion, the ... judge, as trier of fact, has the discretion and the prerogative to assess the credibility of the witnesses and to weigh and value their testimony and opinions." R.J.D. v. State , 1990 OK CR 68, ¶ 16, 799 P.2d 1122, 1125. We have defined an abuse of discretion as "a clearly erroneous conclusion and judgment, one that is clearly against the logic and effect of the facts presented." State v. Keefe , 2017 OK CR 3, ¶ 7, 394 P.3d 1272, 1275 (quoting Neloms v. State , 2012 OK CR 7, ¶ 35, 274 P.3d 161, 170 ).
¶6 Granting Appellee's motion for certification as a Youthful Offender in this case was an abuse of discretion. Sufficient evidence is not found in this record to support the lower court's ruling that priority was given to the first three guidelines set forth in § 2-5-205(E). The lower court's findings for each criteria in Section 2-5-205(E) does not support her conclusion that Appellee met his burden by a preponderance of the evidence. See C.R.B. v. State , 1999 OK CR 1, ¶ 20, 973 P.2d 339, 342 (defendant has the burden to prove by preponderance of the evidence that he should be treated as a youthful offender). There is insufficient evidence in this record to support overriding the presumption that Appellee be treated as an adult.
¶7 The first three factors mandated for consideration by Section 2-5-205(E) do not support Appellee's quest for Youthful Offender status. The present charges were unquestionably committed in an aggressive, violent, premeditated and willful manner; were directed against C.T. and his mother; resulted in the death of C.T.'s mother and in C.T. being shot. Moreover, C.T. witnessed his mother being fatally shot while his brother hid in an adjacent bedroom. But for C.T. feigning death, this may have been a double homicide. The psychological toll on the surviving victims must be considered as well. Finally, Appellee's past history of violence towards his classmates likewise counsels against granting Appellee Youthful Offender status. That is particularly so considering the lower court's finding-fully supported by the evidence-that Appellee portrays all of his school fights "as either justified or paints himself as the victim." Order at 9; (Tr. 827). From the outset, the three factors receiving the greatest weight in this analysis cut against granting Youthful Offender status.
¶8 It is the fourth, fifth and sixth factors upon which the lower court excessively relied to overcome the presumption of adult charging in the present case. The lower court concluded that Appellee's above-average intelligence, along with his ability to distinguish right from wrong, counseled in his favor. The lower court acknowledged that Appellee "is immature for his age and lacks insight into his own behavior, is impulsive, violent, isolates himself, and has an unstable home." Order at 10. The court acknowledged too the many psychopathic characteristics and tendencies revealed by Appellee's psychological testing. This included moderate risks of grandiose sense of self-worth, pathological lying, manipulation for personal gain and high risks for impression management, lack of remorse, failure to accept responsibility and poor anger control.
¶9 According to Jacqueline Bontrager, the OJA psychological clinician who conducted the evaluation in this case, Appellee has a "moderate" risk level for committing future violent criminal acts. Bontrager admits that she did not consider the nature of the present charges in conducting Appellee's risk assessment. Bontrager was also unable to say whether consideration of the nature of the current charges would change her assessment of Appellee's risk of future violent acts. The lynchpin for Bontrager's conclusions that Appellee had a good chance at being rehabilitated in the Youthful Offender program while also protecting the public was based on treatment of Appellee's major depression. However, when asked how treating Appellee's major depression would reduce his risk of committing violent acts, Bontrager was unable to give a coherent explanation for this conclusion:
*777 Q. Let me ask you this. He's currently a moderate risk to reoffend?
A. Uh-huh.
Q. To perpetrate another violent crime; correct?
A. (Witness nods head.)
Q. Can you say with any degree of certainty that treatment for his major depressive disorder, trauma history, all the things we have talked about, if it is successful, can you say with any degree of certainty that that would decrease his risk level?
A. Yes.
Q. Tell me why.
A. I think-okay. I think for someone who is reporting symptoms of depression, psychotic features, hearing things, not able to describe, visual hallucinations that he's experiencing, I think treatment for that would contribute to-would lessen the likelihood of-I don't know.
(Tr. 856) (emphasis added). Defense counsel did not follow-up with Bontrager on this point on cross-examination. Nor was this specific issue addressed in the testimony of Dr. Trentham or Dr. Hand who each endorsed Bontrager's work.
¶10 Further, Bontrager's conclusion that Appellee's amenability to treatment was "good" based on his "positive attitude" towards treatment and intellect is not supported by the record. Appellee told Bontrager during the evaluation that he didn't really need treatment. Bontrager acknowledged this fact in her testimony but claimed Appellee expressed that he wanted treatment at some point towards the end of the evaluation. Bontrager's account of this conversation in her written report, however, suggests little enthusiasm on Appellee's part to undergo treatment for major depression :
When asked if he believes he currently needs counseling, [B.C.E.T.] responded, "Not really. There's nothing for me to talk about. I don't even know why I experience the depression and everything else." When asked what he would work on if he were in counseling, he stated, "Something to get the voices to stop in my head ... and make my body act like it's supposed to." When asked to clarify his last statement, [B.C.E.T.] stated, "Being able to relax and tense up."
(O.R. 68; Tr. 824, 883-84; Def's Ex. 6 at 5). Neither Dr. Trentham nor Dr. Hand in their testimony added to, or expanded upon, this account of Appellee's views on treatment.
¶11 As acknowledged by the lower court, Appellee's claim of hearing voices is inconsistent throughout his responses during the psychological evaluation. Appellee's parents were unaware of him having any history of depression (he claimed to have been previously diagnosed and treated for this already). Nor is there any prior medical documentation of either depression or auditory hallucinations in Appellee. The psychological evidence does show that Appellee misrepresents himself, is immature, overreacts to stress, has anger management issues, is attention seeking, lacks psychological insight into his problems and seeks concrete solutions to his problems like killing a classmate with whom he has a problem. The total record does not support the lower court's conclusion that there is a reasonable likelihood Appellee can be rehabilitated within the OJA Youthful Offender system.
¶12 When the first three factors of the analysis are given the appropriate weight as required by the statute, this is not a close case for showing abuse of the lower court's discretion in certifying Appellee as a Youthful Offender. The lower court focused excessively on the fourth, fifth and sixth factors in contradiction of the statutory command that the first three factors be given greater weight. Moreover, the record evidence does not support basic conclusions underpinning the lower court's findings with respect to the fourth, fifth and sixth factors. When considering the balance of these factors, it is clear that Appellee did not overcome the statutory presumption that he be charged as an adult in this case.
¶13 I see little difference between the present case and our recent decision in State v. K.G.O. , No. JS-2017-909, slip op. (Okl.Cr. Dec. 21, 2017) (unpublished), where we reversed the lower court's certification of the appellee as a Youthful Offender. Sufficient evidence was not found in the record to support the lower court's ruling that priority *778 was given to the first three guidelines. Further, the lower court's findings for each criteria in Section 2-5-205(E) did not support the court's conclusion that K.G.O. met his burden by a preponderance of the evidence. We found that the record presented a lack of evidence to support overriding the presumption that K.G.O. be treated as an adult.
¶14 My analysis of the present case does not amount to a reweighing of the factors presented to the court below. Rather, my conclusion is based on whether the record evidence supports the lower court's ruling (it does not) and whether the lower court gave greater weight to the nature of the crime, the victims' personal injuries and Appellee's past history of violent acts (the court did not). Although we review the lower court's decision for an abuse of discretion, that does not amount to abject deference. Today's decision, in true form-over-substance fashion, fails to appropriately scrutinize the lower court's decision and is inconsistent with K.G.O. That is no doubt little comfort to C.T. and his family who can look forward to years of navigating a legal system that, upon conviction, will treat Appellee as a victim of a broken childhood instead of the aspiring junior psychopath that he appears to be.
¶15 I would grant the State's appeal and order that Appellee stand trial as an adult. I dissent from the majority's decision to affirm the order in this case certifying Appellee as a Youthful Offender.